07-0364-cv
Hobson v. Metro. Life Ins. Co.

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term 2008

(Argued: October 30, 2008          Decided: July 29, 2009)

Docket No. 07-0364-cv

---------------------------------------------------------x

DEBORAH HOBSON,

        Plaintiff-Appellant,

                -- v. --

METROPOLITAN LIFE INSURANCE COMPANY,

        Defendant-Appellee.

---------------------------------------------------------x

B e f o r e :  WALKER, B.D. PARKER, and RAGGI, Circuit Judges.

        Plaintiff-Appellant Deborah Hobson appeals from an order of the United States District Court for the Southern District of New York (Alvin K. Hellerstein, Judge) dismissing her complaint challenging the denial by her ERISA plan administrator, Metropolitan Life Insurance Co., of her claim for long-term disability benefits.  Because we find that the plan administrator acted within its discretion in denying Plaintiff-Appellant's claim, the district court's judgment is AFFIRMED.

JASON A. NEWFIELD, (Justin C. Frankel, on the brief), Frankel & Newfield, P.C., Garden City, N.Y., for Plaintiff-Appellant.

ALLAN M. MARCUS, Lester Schwab Katz & Dwyer, LLP, New York, N.Y., for Defendant-Appellee.

JOHN M. WALKER, JR., Circuit Judge:

Plaintiff-Appellant Deborah Hobson ("Hobson") is a member of an employer-provided health care plan (the "Plan") that is governed by the provisions of the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001-1461 ("ERISA"), and for which claims for benefits are administered by Defendant-Appellee Metropolitan Life Insurance Co. ("MetLife"). Hobson brings this appeal from an order of the United States District Court for the Southern District of New York (Alvin K. Hellerstein, Judge) dated December 12, 2006, granting summary judgment to MetLife, denying Hobson's cross-motion for summary judgment, and dismissing the complaint. Hobson v. Metro. Life Ins. Co., No. 05 CV 7321, Tr. at 29 (S.D.N.Y. Dec. 12, 2006).

Hobson alleges that MetLife's conflict of interest as both evaluator and payor of benefit claims influenced its decision to deny her claim for benefits, requiring this court to review MetLife's determination de novo. She contends that, in any event, MetLife's decision was arbitrary and capricious because it was not supported by substantial evidence. She also avers that MetLife abused its discretion by not affording her a full and fair review of her claim, as required by sections 404(a) and 503

2

of ERISA, 29 U.S.C. §§ 1104, 1133.

Finding that Hobson failed to establish that MetLife was influenced by its structural conflict of interest, we decline to accord this factor any weight in our review of MetLife's denial of Hobson's benefits claim for abuse of discretion. Because we find that substantial evidence supported MetLife's denial of Hobson's benefits claim, and that MetLife afforded her a full and fair review of her claim, we conclude that the district court properly determined that MetLife acted within its discretion as plan administrator in denying the claim. We therefore affirm.

**BACKGROUND**

Hobson worked for KPMG, LLP ("KPMG") from 1998 to February 12, 2001 as a tax technician, a sedentary position which involved sitting at a work-space and using a computer. She challenges MetLife's denial of her claim for long-term disability ("LTD") benefits.

Hobson's Health Insurance Plan

Under KPMG's group health insurance policy with MetLife, MetLife has the "discretionary authority" to interpret the Plan's terms and determine a claimant's eligibility for, and entitlement to, Plan benefits. An employee is eligible for LTD benefits under the Plan beginning twenty-five weeks after becoming "disabled." The Plan considers the employee "disabled" (1) for the next thirty-six months, if she cannot perform the "material and substantial duties of [her] [o]wn [o]ccupation," and (2)

3

after this period, if she cannot perform "any job for which [she is] qualified or . . . may become reasonably qualified . . . ."

Hobson's Claims History

Initial Benefits Claim

After becoming disabled in February 2001, Hobson filed a claim for short-term disability and LTD benefits under the Plan, claiming that she was unable to work. Hobson allegedly suffers from asthma, severe tremors, migraines, depression, ulcerative colitis ("colitis"), ileostomy skin problems, seizures, thyroid cancer, fibromyalgia, sleep apnea, severe fatigue, heaviness in her arms and legs, herniated disks in her lower back and neck, arthritis, and Dercum's disease ("Dercum's"). Hobson initially submitted medical examination reports from three doctors. The first, rheumatologist Dr. Sandra L. Sessoms, diagnosed Hobson with fibromyaglia[1]--a disease impairing cognitive functioning-- and opined that Hobson was unable to work. The second, gastroenterologist Dr. D. Keith Fernandez, diagnosed Hobson with colitis, which involves acute or chronic inflammation of the tissue lining the gastrointestinal system, but stated that Hobson could return to work on August 22, 2001. The third, neurologist

---

[1] Fibromyalgia appears to be a controversial diagnosis, which some physicians contend is a "non-disease," because objective laboratory tests and medical imaging studies cannot confirm the diagnosis. See Don L. Goldenberg, Fibromyalgia: Why Such Controversy?, 54 Annals of the Rheumatic Diseases 3, 3 (1995), available at http://www.pubmedcentral.nih.gov/picrender.fcgi?artid=1005499&blobtype=pdf ("[C]ontroversy persists regarding criteria for diagnosis, potential pathophysiology, and treatment. Some prominent rheumatologists . . . question the very existence of fibromyalgia.") (emphasis omitted); Alex Berenson, Drug Approved. Is Disease Real?, N.Y. Times, Jan. 14, 2008, available at http://www.nytimes.com/2008/01/14/health/14pain.html ("Fibromyalgia is a . . . pain condition, whose very existence is questioned by some doctors.").

Dr. Randolph W. Evans, submitted a report indicating that Hobson had mild lumbar spine abnormalities and no neurological abnormalities, and expressing no opinion as to her ability to work.

MetLife consulted an independent rheumatologist and internal medicine specialist, Dr. Jefrey D. Lieberman, who opined that the evidence Hobson submitted did not demonstrate that she suffered from fibromyalgia or that she could not return to work. Dr. Lieberman contacted Dr. Sessoms, who stated that she was no longer treating Hobson and was not sure if Hobson currently was being treated for fibromyalgia. MetLife approved Hobson's claim for short-term benefits, but on November 5, 2001, denied her claim for LTD benefits.

Hobson appealed MetLife's denial of her LTD benefits claim. Hobson clarified that she continued to be a patient of Dr. Sessoms and was about to undergo treatment for fibromyalgia. Hobson also submitted an evaluation from Dr. Sessoms reiterating her diagnosis that Hobson was unable to work, had limited mobility, and suffered from various medical conditions, including symptoms "consistent with fibromyalgia," colitis, hypertension, insomnia, lung disease, anemia, and depression. Hobson also submitted another report from Dr. Fernandez, which indicated that Hobson was being treated for colitis and that other medical conditions made her "feel much worse."

MetLife referred Hobson's file to Dr. Joseph M. Nesta, an independent physician specializing in internal medicine and

gastroenterology, who concluded that Hobson's colitis "appear[ed] to be stable," that her fibromyalgia was not disabling, and that the MRIs of her spine, which showed only "mild" abnormalities, did not indicate that she was unable to work.  In March 2002, MetLife upheld its denial of Hobson's claim for LTD benefits.

LTD Benefits for Colitis, Rectal Bleeding, and Anemia

In August 2002, after Hobson submitted additional information regarding her colitis, rectal bleeding, and anemia, MetLife approved her LTD benefits claim.  In April 2003, after consulting a physician trained in internal and occupational medicine, who reported that Hobson's colitis and anemia were under control, and that she could perform "most jobs as long as there was ready access to a bathroom," MetLife terminated Hobson's LTD benefits.

LTD Benefits for Colitis-Related Surgery

On June 13, 2003, after Hobson underwent two surgical procedures relating to her colitis, MetLife reinstated her LTD benefits.  At the time, a MetLife nurse consultant disagreed with the reinstatement and recommended that Hobson's benefits be discontinued because her colitis had been corrected by the surgery, and her medical records did not indicate that she was physically or psychologically impaired.

Hobson submitted a physician's report indicating that she had a yeast or fungal infection, and suffered from a "major depressive disorder" whereby she was "unable to engage in stress[ful] situations" or "interpersonal" interactions, and her

6

"emotional and adaptive functioning ma[d]e [returning to work] unfeasible." MetLife's nurse consultant concluded that "the submitted medical findings do not document a significant severity of condition or provide evidence of a functional impairment that would preclude [Hobson] from performing the duties of her sedentary job."

On July 20, 2004, Dr. Nesta, the physician who reviewed Hobson's file upon her initial appeal, reevaluated her case and again concluded that her alleged impairments did not preclude her from working. On July 27, 2004, Hobson's treating internist responded to the reevaluation, stating that he "disagree[d] with [MetLife's] [r]eview due to insufficient data," and expressing concern about Hobson's "possible systemic yeast infection." In August 2004, MetLife terminated Hobson's LTD benefits for the second time.

LTD Benefits for Thyroid Cancer Surgery

In September 2004, after Hobson underwent surgery to treat thyroid cancer, MetLife reinstated her LTD benefits for "a closed period of time," until November 12, 2004. The physician who performed the surgery recommended that Hobson return to work in January 2005. MetLife informed Hobson that by this time, over thirty-six months had passed from her initial claim for benefits, meaning that in order to be "disabled" under the Plan, she was required to show that she could not perform the duties of any job "reasonably fitted by [her] education, training, and experience," and not only the duties of her actual occupation.

7

In appealing MetLife's termination of her LTD benefits in 2004, Hobson enclosed an updated report from Dr. Sessoms, which explained that Hobson had some difficulty standing, walking, and sitting.  Hobson also included a report from Dr. Paul Subrt, a dermatologist, who diagnosed her with Dercum's, which is a "rare, chronic condition" whose symptoms include "painful adipose tissue, extreme weakness and fatigability, chronic generalized pain, fibromyalgia, epilepsy, cognitive dysfunction and depression," has no effective treatment, and "can lead to lifelong debilitating disabilities."

MetLife had two independent consultants review Hobson's file, both of whom concluded that none of Hobson's alleged impairments rendered her unable to work.  The first, an internist, explained that the Dercum's diagnosis was not well-documented or supported, and that Hobson had not been given a treatment plan.  The second, a neurologist and psychiatrist, concluded that although Hobson had "a number of chronic medical problems which are severe," she appeared to be "functional" and was "able to work without any difficulty" at her sedentary job. In March 2005, MetLife upheld its denial of Hobson's claim for LTD benefits.

MetLife granted Hobson's request for additional, discretionary review of the claim denial and referred her file to two more independent physicians.  The first, a psychiatrist,

explained that "[t]here [we]re no complete psychiatric evaluations in the documentation or any complete mental status examinations." This consultant also determined that Hobson "herself had submitted numerous letters [to MetLife which we]re . . . very well written and contain[ed] no hints of any cognitive impairment." The second consultant, a dermatologist, opined that the Dercum's "diagnosis actually was made by Ms. Hobson, not by her doctor," and "found that she made it according to information . . . on the Internet." Dr. Subrt, the physician who authored the brief, one-paragraph letter diagnosing Hobson with Dercum's, told MetLife's consultant that he "d[id] not feel that Ms. Hobson [wa]s disabled and d[id not] understand why she c[ould] not do her job, which is sedentary." The second consultant also concluded that, aside from Hobson's subjective reports of pain, no objective finding confirmed that she was unable to work. On May 5, 2005, MetLife informed Hobson that it upheld its denial of her benefits claim and would not consider any further appeals, because Hobson had "exhausted [her] administrative remedies under the [P]lan."

Hobson then submitted two letters to supplement her claim. The first, authored by Dr. Subrt, explained that although he did not "discern" any dermatologic disability, he was not qualified to opine on whether she otherwise suffered disabilities. The second, a letter from her treating psychologist, stated that Hobson's depression had since worsened to the point of "severe

9

despondent episodes" of "sufficient severity that [she wa]s unable to function consistently enough to sustain employment." In letters dated May 11 and 19, 2005, MetLife informed Hobson that her additional submissions had not persuaded it to reconsider the denial of her benefits claim.

The ERISA Action

On August 18, 2005, Hobson responded to Metlife's denial of her administrative appeals by instituting this action. Her complaint alleges that MetLife was influenced by its conflict of interest as both the evaluator and payor of benefit claims, warranting de novo review, and that, in any event, it abused its discretion in denying her claim for LTD benefits. The parties then filed cross-motions for summary judgment.

On December 12, 2006, the district court granted MetLife's motion and denied Hobson's, concluding that MetLife did not act arbitrarily and capriciously in denying Hobson's claim for benefits, because, inter alia, MetLife "reasonably took up each and every aspect of the claim. . . ." Hobson, No. 05 CV 7321, Tr. at 28.

This appeal followed.

**Discussion**

I.  Standard of Review

In an ERISA action, we review the district court's grant of summary judgment based on the administrative record de novo and apply the same legal standard as the district court. Pagan v.

10

NYNEX Pension Plan, 52 F.3d 438, 441 (2d Cir. 1995). "Summary judgment is appropriate only where the parties' submissions show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fay v. Oxford Health Plan, 287 F.3d 96, 103 (2d Cir. 2002).

Although generally an administrator's decision to deny benefits is reviewed de novo, where, as here, "written plan documents confer upon a plan administrator the discretionary authority to determine eligibility, we will not disturb the administrator's ultimate conclusion unless it is 'arbitrary and capricious.'" Pagan, 52 F.3d at 441. After the Supreme Court rendered its decision in Metropolitan Life Insurance Co. v. Glenn, -- U.S.--, 128 S. Ct. 2343 (2008), this court explained that "a plan under which an administrator both evaluates and pays benefits claims creates the kind of conflict of interest that courts must take into account and weigh as a factor in determining whether there was an abuse of discretion, but does not make de novo review appropriate." McCauley v. First Unum Life Ins. Co., 551 F.3d 126, 133 (2d Cir. 2008). A plaintiff's showing that the administrator's conflict of interest affected the choice of a reasonable interpretation is only one of "several different considerations" that judges must take into account when "review[ing] the lawfulness of benefit denials." Id. (internal quotation marks omitted).

11

In light of this, we find unpersuasive Hobson's assertion that de novo review is warranted on the basis of MetLife's structural conflict of interest. We now turn to the question of whether the district court erred in weighing MetLife's conflict of interest.

Hobson alleges that the district court failed to take into account two documents in the record which show that MetLife was influenced by its conflict of interest. The district court properly explained that it "must defer to the administrator's decision unless the decision is arbitrary and capricious," and that "the deference to be given to the administrator doesn't change unless the plaintiff shows that the administrator was, in fact, influenced by the conflict of interest." Hobson, No. 05 CV 7321, Tr. at 4-5. The district court, however, failed to (1) discuss the evidence allegedly showing that MetLife's conflict of interest influenced its decision-making, (2) determine what role MetLife's conflict of interest may have played in its decision, and (3) give that conflict any weight, as required by Glenn. See 128 S. Ct. at 2351; see also McCauley, 551 F.3d at 133.

The first document is a September 14, 2004 email from one KPMG employee to another stating that MetLife "is requesting a very detailed job description" for Hobson and "is trying to cover all basis [sic] for denying the LTD claim." The email suggests that a third-party, who was not employed by Metlife, believed that MetLife might be motivated by a desire to deny Hobson's

12

claim. This suggestion, however, is belied by MetLife's decision to reinstate Hobson's benefits six days later, after Hobson informed MetLife that she had undergone surgery for thyroid cancer.

The second document is a November 2002 "diary note" in Hobson's file in which a MetLife nurse recommended that the case manager procure "updated medical" information and a "referral" to other medical experts, because colitis "is a wax and wane type of illness/disease," and Hobson "would most likely not be found to be T[otally] D[isabled] from any [occupation] . . . ." Rather than indicating that MetLife was influenced by its conflict of interest, this note simply reflects the reviewing nurse's reasonable doubts as to whether Hobson's condition would continue to render her disabled, in light of a letter from the year in which Hobson's own reviewing physician indicated that Hobson's colitis was temporary and that she would be able to return to work.

We are not persuaded that these documents show that MetLife's conflict of interest as evaluator and payor of benefits influenced its reasonable interpretation of Hobson's claim for benefits. Thus, we decline to afford MetLife's conflict of interest any weight in our review of MetLife's benefit denial.

II. Substantial Evidence Supporting MetLife's Determination

Under the arbitrary and capricious standard of review, we may overturn an administrator's decision to deny ERISA benefits

13

"only if it was without reason, unsupported by substantial evidence or erroneous as a matter of law. This scope of review is narrow[;] thus[,] we are not free to substitute our own judgment for that of [the insurer] as if we were considering the issue of eligibility anew." Pagan, 52 F.3d at 442 (internal quotation marks and citations omitted).

Hobson contends that MetLife's decision is not supported by substantial evidence because MetLife relied on its paid medical reviewers' "speculative inferences," despite "the reliable evidence of Hobson's doctors," and specifically relied upon Dr. Nesta's report, even though he "failed to consider fibromyalgia in his review" and only presented "opinions [that] were at best 'generic.'"

After August 2004, MetLife took five actions, each of which had the effect of disallowing Hobson's claim for LTD benefits: (A) the August 2004 termination of benefits after she recovered from colitis-related surgery; (B) the December 2004 termination after she recovered from thyroid cancer surgery; (C) the March 2005 denial of Hobson's first appeal after the thirty-six month period had passed; (D) the May 5, 2005 denial of benefits after additional review; and (E) the May 19, 2005 refusal to consider further appeals despite two letters Hobson submitted from

14

attending physicians.[2]  We evaluate each of these actions in turn.

A.  <u>August 2004 Termination of LTD Benefits After Recovery</u>
     <u>from Colitis-Related Surgery</u>

First, we conclude that MetLife's termination of Hobson's LTD benefits after she underwent surgery to address her colitis was not arbitrary and capricious.

The report prepared in 2004 by Dr. Nesta, the independent physician consulted by MetLife, concluded that Hobson's alleged impairments did not preclude her from working.  Specifically, Dr. Nesta determined that Hobson's surgery "should have cured her ulcerative colitis," the MRI and her neurologist's progress notes indicated that she did not have "significant radiculopathy," and her neurologist's decision to not take Hobson out of work indicated that he "could not find any neurologic basis for [Hobson's] seizures and migraines."  As for Hobson's asthma, fungal infection, and fibromyalgia, Dr. Nesta determined that these conditions were not disabling.

Hobson's own infectious disease specialist agreed that her fungal infection did not prevent her from working.  Although her treating internist "d[id] not agree that most of her ailments do not preclude her from working" because he was concerned about her

---

[2]     Because Hobson's appeal focuses only on MetLife's decision to terminate her LTD benefits in August 2004 and subsequent decisions not to reinstate benefits, we review only these determinations.  Therefore, we do not examine MetLife's earlier decisions to deny Hobson's initial benefits claim in November 2001 and her first appeal in March 2002, or to terminate her LTD benefits after her symptoms of colitis and anemia improved in April 2003.

15

yeast infection, he did not submit additional information to support Hobson's claim for benefits. In fact, he conceded that there was "insufficient data" to determine her ability to work.

Hobson specifically challenges on appeal MetLife's reliance on Dr. Nesta's 2004 report because Metlife "failed to consider fibromyalgia in his review." Upon evaluating Hobson's "final diagnosis of fibromyalgia," Dr. Nesta's report again concluded that fibromyalgia "does not usually preclude an individual from working." Two years earlier, however, Dr. Nesta explained why he concluded that Hobson was not disabled due to her fibromyalgia: Hobson had no "documented trigger point tenderness" which is normally part of a fibromyalgia diagnosis, no "hard evidence . . . substantiate[d] her disability from a rheumatologic viewpoint," and her neurological examinations were "normal." Moreover, Dr. Lieberman, another independent consultant who evaluated Hobson's record in 2001, opined that there wasn't "any substantial global or objective evidence to support" the opinion that Hobson was "unable to perform any occupation because of her fibromyalgia;" instead, Dr. Lieberman stated that "[t]here certainly are a wide range of treatments available for patients with fibromyalgia to allow them to be more productive, gainfully employed, and have a better quality of life."

As the Supreme Court has explained, "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose

16

on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003). Thus, MetLife acted within its discretion in relying upon the conclusions of its independent consultants' three reports. Because the three reports provided detailed, substantive analysis of Hobson's fibromyalgia, we cannot find that MetLife unreasonably failed to consider Hobson's fibromyalgia.

As Hobson's own treating physician conceded, it is far from clear that Hobson's medical records demonstrated that she was disabled; rather, we find ample evidence in Hobson's file to support MetLife's determination that she failed to make this showing.

B.    December 2004 Termination After Thyroid Cancer Surgery

In December 2004, after reinstating Hobson's LTD benefits when she underwent surgery for thyroid cancer, MetLife terminated her benefits. Metlife reasonably concluded that Hobson was not disabled, given that the same physician who operated on Hobson's thyroid cancer also recommended that she return to work in January 2005. Thus, the record substantially supports MetLife's termination of her LTD benefits, a decision we do not find arbitrary and capricious.

C.    March 2005 Denial of Initial Appeal After Thirty-Six Month Period

17

In appealing the denial of her benefits claim, Hobson submitted a report from Dr. Subrt diagnosing her with Dercum's and an updated evaluation from Dr. Sessoms explaining that Hobson's symptoms included several chronic medical conditions.

Substantial evidence in the record supports MetLife's determination that Hobson was not disabled due to Dercum's. As the first consultant, internist Dr. Blair D. Truxal, explained, Dr. Subrt's letter consisted only of "one brief paragraph," which Hobson supplemented with "fourteen pages of information on [Dercum's] disease . . . researched from the Internet." Dr. Truxal concluded that "no diagnostic criteria or physical findings" supported the diagnosis. In fact, he pointed to four diagnostic criteria that Hobson lacked. Finally, Dr. Truxal explained that Hobson's records did not specify which of the three types of Dercum's she allegedly had, or mention any treatment plan for the disease.

MetLife's additional determination that none of Hobson's other alleged ailments precluded her from work was not unreasonable. The second consultant, neurologist and psychiatrist Dr. John F. Delaney, Jr. opined that, although Hobson had "a number of chronic medical conditions which are severe," she remained "functional" and was "able to work without any difficulty" at her sedentary job. Because MetLife was entitled to rely on these written reports, Black & Decker, 538

18

U.S. at 834, its denial of Hobson's claim was neither arbitrary nor capricious.

   D.   May 2008 Denial After Additional Review of Dercum's Diagnosis

Upon granting Hobson's request for additional review of the denial of her LTD benefits claim, MetLife referred Hobson's file to two additional physicians.  Both reports support MetLife's decision to uphold its benefit denial.

The first report from a psychiatrist concluded that Hobson was not cognitively impaired because she had not submitted any complete psychiatric or mental status examination supporting her claim, and seemed able to communicate cogently in writing with MetLife.

The second report provided additional support for MetLife's determination that Hobson was not disabled due to Dercum's.  The consultant, a dermatologist, opined that Hobson herself, rather than a doctor, had diagnosed herself with Dercum's, and that no objective evidence accompanied her subjective reports of pain to demonstrate that she was disabled.

Hobson's own physician, Dr. Subrt, who wrote the letter stating his belief that she had Dercum's, conceded that he "d[id] not feel that Ms. Hobson [wa]s disabled and d[id not] understand why she cannot do her job, which is sedentary."  Because Hobson's treating physician and two independent consultants all opined that Hobson was not disabled from working, we find that MetLife's

19

decision to uphold its denial of her claim for benefits fell squarely within its discretion.

E. May 2005 Refusal to Consider Further Appeals

Both of the letters Hobson submitted after MetLife informed her that it would not consider any further appeals failed to provide additional, objective evidence that she was disabled.

The first letter from Dr. Subrt merely clarified that he was not qualified to opine on whether she suffered non-dermatologic disabilities, and explained that he did not "discern" any dermatologic disability. The second letter from Hobson's psychologist stated that Hobson was unable to function or work due to her depression, but did not include or append any evidence substantiating this conclusion.

In light of the substantial evidence in Hobson's file supporting MetLife's determination that she was not disabled from sedentary work, we find that MetLife did not abuse its discretion in May 2005 by refusing to consider Hobson's request for a further appeal.

III. MetLife's Full and Fair Review of Hobson's Claim

Section 503(2) of ERISA requires that claims for benefits be afforded a "full and fair review by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C. § 1133(2). The district court concluded that MetLife afforded Hobson such a review by "reasonably t[aking] up each and every aspect of the claim." Hobson, No. 05 CV 7321, Tr. at 28.

20

Hobson alleges that MetLife failed to fully and fairly review her benefits claim by (A) not notifying her of what additional information she needed to "perfect her claim"; (B) requiring objective support for her medical conditions; (C) failing to consider all the medical evidence she submitted; (D) giving undue weight to the opinions of MetLife's consultants over those of Hobson's treating physicians; (E) failing to request an independent medical examination, as provided for in its own policy; and (F) not considering the Social Security Administration's ("SSA") finding of disability for the same medical conditions for which she requested LTD benefits from MetLife.  We review each argument in turn and find each to be without merit.

A.   ERISA Notice Requirement

Section 503(1) of ERISA contains a general requirement whereby, upon denying a claim for benefits, a plan administrator must provide the claimant with "adequate notice in writing . . . setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant."  29 U.S.C. § 1133(1).  ERISA regulations further require that the administrator furnish the claimant with a "description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary . . . ."  29 C.F.R. § 2560.503-1(g)(1)(iii).  As we have explained, the purpose of

21

ERISA's notice requirement is to "provide claimants with enough information to prepare adequately for further administrative review or an appeal to the federal courts." Juliano v. Health Maint. Org. of NJ, 221 F.3d 279, 287 (2d Cir. 2000) (internal quotation marks omitted).

In past cases--including the two cited by Hobson--in which courts found that plan administrators failed to substantially comply with the ERISA notice requirement by not notifying claimants of information necessary to perfect their claims, the administrators also failed to explain the specific reasons for the benefit denial. See, e.g., Schleibaum v. Kmart Corp., 153 F.3d 496, 499 (7th Cir. 1998); Halpin v. W.W. Grainger, Inc., 962 F.2d 685, 694 (7th Cir. 1992); Dzidzovic v. Bldg. Serv. 32B-J Health Fund, No. 02 CV 6140, 2006 WL 2266501, at *8, 11 (S.D.N.Y. Aug. 7, 2006); Dawes v. First Unum Life Ins. Co., No. 91 Civ. 0103, 1992 WL 350778, at *3-5 (S.D.N.Y. Nov. 13, 1992).

There is no question that MetLife communicated to Hobson its specific reasons for denying her LTD benefits. After Hobson alleged that she suffered from several conditions including debilitating depression, seizures, and Dercum's, MetLife's March 2005 letter explained why it concluded that she "seem[s] to be functional." In terms of her depression, the letter stated that what is "lacking is whether the depression would be severe enough to actually have suicidal ideation or whether this depression requires inpatient hospitalization." As for her seizures, the

22

letter stated that "what was lacking from [her] file" was "whether [she was] having ongoing seizures that are not well controlled and prevent [her] from driving or getting around."  As for her Dercum's diagnosis, MetLife explained that Hobson's records lacked evidence that she exhibited four diagnostic criteria for Dercum's, and that "there was no mention in the records of what type [of Dercum's she] allegedly ha[s]" or "a treatment plan for th[e] disease."  The letter further stated that Hobson's colitis and thyroid cancer appeared to be cured by the surgical procedures she underwent, and that her medical records did not demonstrate that she was disabled due to spinal degenerative disease or debilitating migraines.

It is noteworthy that after Hobson's initial claim for benefits was denied in November 2001 and she submitted additional medical information, MetLife granted Hobson LTD benefits on three separate occasions, thereby reflecting that MetLife "reasonably took up each and every aspect" of Hobson's claims. Juliano, 221 F.3d at 287.  Finally, Hobson's ability to perfect her claim three times supports our conclusion that she was fairly apprised of how she could "prepare adequately" for subsequent appeals of earlier benefit denials. Id.  Therefore, we are persuaded that MetLife substantially complied with ERISA's notice regulations.

B.  Requirement of Objective Medical Evidence

Hobson alleges that MetLife failed to afford her full and fair review of her LTD benefits claim by requiring "objective

23

support for her medical conditions," because MetLife's own policy does not require such proof, and because this court has clarified that subjective complaints alone may constitute sufficient evidence of disability. See Connors v. Conn. Gen. Life Ins. Co., 272 F.3d 127, 136 (2d Cir. 2001) ("It has long been the law of this Circuit that the subjective element of pain is an important factor to be considered in determining disability.") (internal quotation marks omitted).

This court has never directly addressed whether it is reasonable for a plan administrator, who retains the discretionary authority to interpret the terms of its plan, to require the plaintiff to produce objective medical evidence, where such a requirement is not expressly set out in the plan. However, "several courts in this district have found that it is not unreasonable or arbitrary for a plan administrator to require the plaintiff to produce objective medical evidence of total disability in a claim for disability benefits." Fitzpatrick v. Bayer Corp., No. 04 Civ. 5134, 2008 WL 169318, at *10 (S.D.N.Y. Jan. 17, 2008); see also Suren v. Metro. Life Ins. Co., No. 07-CV-4439, 2008 WL 4104461, at *11 (E.D.N.Y. Aug. 29, 2008) (collecting cases and concluding that "MetLife did not abuse its discretion when it based its opinion on objective tests and examinations, despite Suren's subjective complaints of fatigue and weakness").

We conclude that it is not unreasonable for ERISA plan

administrators to accord weight to objective evidence that a claimant's medical ailments are debilitating in order to guard against fraudulent or unsupported claims of disability. As the Eighth Circuit has explained, even in a claim involving fibromyalgia, "trigger-point findings . . . constitute objective evidence of the disease," and it is not unreasonable for a plan administrator to require such evidence so long as the claimant was so notified. Johnson v. Metro. Life Ins. Co., 437 F.3d 809, 813-14 (8th Cir. 2006). When MetLife denied Hobson's initial appeal in March 2002, it informed her that "there has been no documentation . . . that substantiates documented trigger point tenderness that falls within the major criteria for the diagnosis of fibromyalgia." In light of this notification, MetLife acted within its discretion in requiring some objective evidence that Hobson was disabled from performing in a sedentary capacity.

Such a requirement is not contradicted by any provision of MetLife's own policy, which provides that an employee's claim may be denied if she cannot "obtain sufficient medical evidence to support" her disability claim. By the terms of the Plan, MetLife retains the discretion to interpret what constitutes "sufficient medical evidence," and MetLife's determination that such evidence requires objective support, rather than merely subjective reports of pain, is reasonable. In this case, MetLife's conclusion that Hobson's subjective pain did not rise to the level of rendering her unable to work was supported by Dr. Subrt, the very doctor

25

who diagnosed Hobson with Dercum's, and who reached the same conclusion. Thus, we decline to hold that MetLife's decision to deny Hobson's claim for benefits, because she failed to provide objective evidence showing that she was disabled from sedentary work deprived her of full and fair review.

C. Consideration of All Medical Evidence

Hobson also alleges that MetLife did not properly consider all of her medical evidence, ignoring her non-physical ailments and co-morbid conditions, the impact of her medications, and her subjective complaints of pain. We have already rejected Hobson's allegation that MetLife ignored her subjective complaints in the prior section. We now turn to the remaining evidence which Hobson alleges that MetLife arbitrarily and capriciously ignored.

There is no merit to Hobson's contentions that MetLife "intentionally ignored" evidence that she was disabled due to non-physical ailments and co-morbid conditions, that is, conditions that pertain to two or more disorders simultaneously-- here, fatigue, inability to concentrate, cognitive functioning, and memory loss--and that MetLife should have evaluated such evidence together, rather than in isolation. MetLife had two independent psychiatrist consultants evaluate Hobson's file. The first concluded that Hobson's "psychiatric and cognitive functioning [wa]s essentially within normal limits," that there were no "objective findings of any cognitive impairment or problems with memory or cognition," and that her own

26

correspondences indicated that her non-physical ailments did not impair her ability to function. The second explained that Hobson's depression did not render her unable to perform her duties, as MetLife mentioned in its March 2005 letter to Hobson. Thus, MetLife expressly considered Hobson's non-physical ailments and co-morbid conditions, and the two consultant reports that Metlife relied upon substantially supported MetLife's denial of Hobson's claim for LTD benefits. See Suren, 2008 WL 4104461, at *11 (finding that benefit denial was not arbitrary and capricious where independent physicians determined that claimant was not cognitively impaired).

We are also not persuaded that MetLife abused its discretion by not taking into consideration the side effects Hobson allegedly suffered due to the daily medications she took to address her conditions. Hobson's brief failed to elaborate on this argument: Specifically, she failed to explain how exactly she had established to Metlife that her medications rendered her unable to work. For example, Hobson could have provided, but did not in fact provide, letters from her treating physicians opining that her medications hindered her functional abilities. As the Tenth Circuit explained in rejecting a similar claim, "the question for this court is not whether MetLife made the 'correct' decision [but] whether MetLife had a reasonable basis for the decision that it made." Chalker v. Raytheon Co., 291 F. App'x 138, 145 (10th Cir. 2008). Here, MetLife reasonably concluded

27

that Hobson remained able to work, relying on the opinions of seven independent consultants, one of whom expressly stated that Hobson "ha[d] been on medications for a considerable period of time, and these medications d[id] not give her side effects, according to the medical records reviewed," and another who explained that Hobson appeared cognitively functional, as indicated by her detailed and cogent communications with MetLife. In light of these evaluations, MetLife reasonably concluded that Hobson remained able to function despite taking various medications to treat her medical ailments.

D.    Weighing of Competing Medical Evaluations

Hobson also contends that MetLife gave undue weight to the opinions of the independent physicians it consulted, first by retaining those consultants, and then by affording more weight to those consultants' opinions than to those of Hobson's treating physicians.  We find no merit to Hobson's argument.

MetLife had a total of seven independent physicians, none of whom was a MetLife employee, and all of whom were Board-certified in one or more of the specialty areas relevant to Hobson's diagnoses and conditions, review Hobson's file.  MetLife did not abuse its discretion by considering these trained physicians' opinions solely because they were selected, and presumably compensated, by Metlife.  See Suren, 2008 WL 4104461, at *11 ("That they were paid consultants does not disable MetLife from considering their opinions in making benefits decisions.").

28

Indeed, it is customary for plan administrators to do so in evaluating ERISA claims. Second, MetLife is not required to accord the opinions of a claimant's treating physicians "special weight," especially in light of contrary independent physician reports. Black & Decker, 538 U.S. at 834.

Moreover, nothing in the record indicates that MetLife arbitrarily refused to credit Hobson's medical evidence. MetLife's consultants repeatedly attempted to contact Hobson's treating physicians, several of whom concluded that Hobson's diagnoses and conditions did not inhibit her from working.

Hobson specifically challenges MetLife's reliance on its independent physicians' reports in determining that she was not disabled due to Dercum's, which these physicians characterized as a rare affliction which "nobody is sure about." However, as we have already noted, Hobson's own treating physician, the same one who sent a letter diagnosing Hobson with Dercum's, concluded that she was not disabled due to Dercum's. Thus, there is no merit to Hobson's argument that MetLife unreasonably relied upon speculative and "unqualified" physicians' opinions.

E.   MetLife's Decision Not to Request an Independent Examination

MetLife declined to order an in-person, independent medical examination ("IME"), as provided for in the Plan. In challenging MetLife's decision as arbitrary and capricious, Hobson relies on Chan v. Hartford Life Ins. Co., No. 02 Civ. 2943, 2004 WL 2002988

29

(S.D.N.Y. Sept. 8, 2004), in which the district court found that the plan administrator's failure to order an IME "call[ed] into question its decision to terminate [claimant]'s benefits." Id. at *9. As in Chan, MetLife's benefits policy permits MetLife to order an in-person IME, indicating that such an evaluation is valuable in certain situations.

The six listed situations include the following three: "[c]larification when the stated diagnosis is not usually disabling," "[t]he stated diagnosis is vague and supported only by subjective information," and "[t]here are inconsistencies in the medical evidence or conflicting opinions from various medical examinations (i.e. . . . the [SSA])." These factors, which comprise half of the enumerated factors, are present in Hobson's case.

Consistent with its policy, MetLife could have ordered an IME because it explained to Hobson that her neurologic, gastroenterologic, and psychiatric conditions did not render her unable to perform a sedentary position, and because Hobson's claim was rejected due to her failure to provide objective evidence of the ailments she subjectively reported. Also, there were conflicting determinations as to whether Hobson's fibromyalgia was disabling, and Hobson was awarded social security disability benefits based on the same medical reports submitted to MetLife.

However, as the four circuits that have addressed the

30

question have concluded, where the ERISA plan administrator retains the discretion to interpret the terms of its plan, the administrator may elect not to conduct an IME, particularly where the claimant's medical evidence on its face fails to establish that she is disabled.[3]

We share the Seventh Circuit's concern that requiring the plan administrator to order an IME, despite the absence of objective evidence supporting the applicant's claim for benefits, risks casting doubt upon, and inhibiting, "the commonplace practice of doctors arriving at professional opinions after reviewing medical files," which reduces the "financial burden of conducting repetitive tests and examinations." Davis v. Unum Life Ins. Co. of Am., 444 F.3d 569, 577 (7th Cir. 2006).

As in past sister circuit cases finding that a plan administrator need not order an IME, here, Hobson failed to produce sufficient objective evidence supporting her benefits claim. Moreover, several of her own treating physicians opined

_____

[3] See, e.g., Williams v. Aetna Life Ins. Co. of Boston, 509 F.3d 317, 325 (7th Cir. 2007) (finding reasonable a denial of benefits where the administrator refused to order an independent review and there was a lack of "objective support" regarding the claimant's "functional abilities"); Rutledge v. Liberty Life Assurance Co., 481 F.3d 655, 661 (8th Cir. 2007) ("An ERISA plan administrator need not order an [IME] when the insured's evidence supporting a disability claim is facially insufficient."); Calvert v. Firstar Fin., Inc., 409 F.3d 286, 295 (6th Cir. 2005) ("Although th[e plan] provision allows Liberty to commission a physical examination of a claimant, there is nothing in the plan language that expressly bars a file review by a physician in lieu of such a physical exam.") (emphasis in original); Nicula v. First Unum Life Ins. Co., 23 F. App'x 805, 807 (9th Cir. 2001) (finding no need for a physical exam where no "conflicting medical evidence" rebutted the treating physician's report). See also Fought v. Unum Life Ins. Co. of Am., 379 F.3d 997, 1015 (10th Cir. 2004) (denying an IME where the plan administrator was unable to offer "more than a scintilla" of evidence that claimant was not disabled under the plan) (internal quotation marks omitted).

31

that she was able to return to work, thereby significantly undermining her benefits claim.  Finally, the Plan's guidelines only list situations in which IMEs may be "valuable," not where they are necessary.  Because this court only disturbs a plan administrator's determination if it is arbitrary and capricious, we are unconvinced that the Plan obliged MetLife to conduct an IME; rather, by not ordering such an examination, MetLife simply exercised its discretion to decline to pursue one option at its disposal.

F.    Consideration of the SSA's Finding of Disability

MetLife required Hobson to apply for social security disability benefits, and in May 2003, the SSA awarded Hobson such benefits on the basis that she suffered from colitis and fibromyalgia.  Hobson alleges that both the district court and MetLife failed to consider her social security disability benefits award in making their LTD determinations.

Where the administrator "requires a claimant to pursue social security disability to reduce the amount of benefits due under the plan," Leffew v. Ford Motor Co., 258 F. App'x 772, 778 -779 (6th Cir. 2007), and subsequently determines that the claimant is not entitled to ERISA benefits, the Sixth Circuit has "counsel[led] a certain skepticism of a plan administrator's decision-making," Calvert, 409 F.3d at 295; see also Leffew, 258 F. App'x at 779.  Although the SSA's definition of the term "disability" is not necessarily coextensive with an ERISA plan's

32

definition of that term, see Kunstenaar v. Conn. Gen. Life Ins. Co., 902 F.2d 181, 184 (2d Cir. 1990), the Sixth Circuit nevertheless considers an award of social security disability benefits to be a relevant factor in determining whether a claimant is disabled under an ERISA plan, see Calvert, 409 F.3d at 295.

Here, it does not appear that either MetLife or the district court considered the SSA's conclusion that Hobson was disabled, as that term is defined by the SSA; neither MetLife's letters denying Hobson's claim for LTD benefits nor the district court's decision discuss that conclusion. Still, between the time that Hobson submitted the diagnoses upon which the SSA awarded her disability benefits and August 2004, when MetLife sent her its next letter terminating her LTD ERISA benefits, she had undergone surgery for her colitis. MetLife terminated Hobson's benefits on the basis that she had successfully recovered from this surgery; thus, the SSA's determination as to her pre-surgical condition was no longer relevant when Metlife denied her benefits claim. Compare with Ladd v. ITT Corp., 148 F.3d 753, 755-56 (7th Cir. 1998) (determining that the claim denial was "irrational" where the claimant's medical condition worsened after the SSA awarded her benefits but before the plan administrator denied her ERISA benefits).

As for Hobson's fibromyalgia diagnosis, substantial evidence supported MetLife's determination that the condition did not

render her disabled, as explained above.  Supra Part II.A; see also Suren, 2008 WL 4104461, at *10 ("In light of all the medical evidence in the record, . . . [the court] cannot responsibly find [the administrator's] decision to be without reason . . . .").

We encourage plan administrators, in denying benefits claims, to explain their reasons for determining that claimants are not disabled where the SSA arrived at the opposite conclusion:  Doing so furthers ERISA's goal of providing claimants with additional information to help them perfect their claims for subsequent appeals.  See 29 U.S.C. § 1133; 29 C.F.R. § 2560.503-1(g)(1)(iii).  Nonetheless, especially in light of the substantial evidence supporting its determination, we decline to hold that MetLife's failure to do so in this case renders its denial of Hobson's LTD benefits claim arbitrary and capricious.

**CONCLUSION**

For the foregoing reasons, the judgment of the district court is AFFIRMED.

34