**Ralph FRETTA, Plaintiff,**

v.

**LIBERTY LIFE ASSURANCE COMPANY OF BOSTON, Defendant.**

No. 2:09–cv–00035.

United States District Court, D. Vermont.

June 23, 2010.

Norman E. Watts, Jr., Watts Law Firm, PC, Woodstock, VT, for Plaintiff.

James E. Preston, Pierson Wadhams Quinn Yates & Coffrin, LLP, Burlington, VT, for Defendant.

## MEMORANDUM OPINION AND ORDER

WILLIAM K. SESSIONS III, Chief Judge.

Plaintiff Ralph Fretta filed this action pursuant to the Employee Retirement and Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1461, in response to the denial of his short-term disability benefits claim by Defendant Liberty Life Assurance Company of Boston ("Liberty Life"). Cross-motions for summary judgment are currently pending before the Court. For the reasons set forth below, Liberty Life's motion (Doc. 12) is **denied**. Fretta's motion (Doc. 14) is **granted in part and denied in part**. The case is remanded to Liberty Life for further proceedings consistent with this opinion.

### Background

The following facts are undisputed. Fretta was employed at the Rutland Regional Medical Center ("RRMC") as a licensed registered respiratory therapist ("RT") in the cardiopulmonary department. In his position, Fretta was responsible for, among other things, direct patient care, including delivering respiratory therapy, administering medications, administering inflation therapy, and administering intravenous medications.

Liberty Life issued RRMC a Group Disability Income Policy ("the Policy"), which provides long-term and short-term disability insurance coverage for certain employees of RRMC. As a full-time employee, Fretta was eligible for disability coverage. Liberty Life is the benefits claims administrator, and according to the terms of the Policy has sole authority to determine an employee's eligibility for benefits.

### I. Fretta's Medical Condition

Fretta began having symptoms of acute depression and anxiety following his 23 year-old son's diagnosis of lymphoma in January 2008. Fretta took a leave of absence from his job pursuant to the Family Medical Leave Act to care for his son, beginning on January 25, 2008. On April 17, 2008, Fretta saw his primary care physician, Dr. Timothy Cook, for "extreme anxiety" and "intermittent uncontrollable dysphoria." (Administrative Record "AR" 17.) Dr. Cook diagnosed "[a]cute situational anxiety/depression/grief," resulting in "[i]nability to perform work duties." (AR 17.) Fretta "decline[d] mental health referral or medications at this time," which seemed "appropriate" to Dr. Cook, and was to return for a follow-up in one to two months or as needed if he desired a counseling referral or medications. (AR 17.)

Fretta brought forms for Dr. Cook to complete in order to apply for short-term disability benefits. In his Medical Examination/Certification Report Dr. Cook provided his diagnosis of situational anxiety/depression/grief, and his opinion that the condition did not require continuing treatment by a health care provider. He indicated that Fretta was substantially

limited in his ability to work, that he could not perform any duties, due to acute emotional distress, and that there were no accommodations that would enable Fretta to perform his work safely. (AR 18–19.)

Dr. Cook saw Fretta again on April 30, 2008. During this visit Dr. Cook completed Liberty Life's Functional Mental Status Evaluation, and scored Fretta on the Wakefield Depression Scale and the Community Care Hospital Anxiety Scale. (AR 36.) Dr. Cook noted that Fretta had "some difficulty thinking through tasks," "feels overwhelmed easily," "is having difficulty focusing, finishing tasks and is afraid of making mistakes during work." He determined that Fretta retained "minimal" functional abilities, and that Fretta could not currently perform his job. (AR 38.) Based on the Scales' scores, Dr. Cook reaffirmed his diagnosis of depression and anxiety, and concluded that Fretta needed to show improvement on the Scales before he could return to work. (AR 39.) In his treatment notes, Dr. Cook stated that Fretta:

> [i]s having severe feelings of anxiety and depression that are making it impossible for him to focus and make judgments relative to his work as a respiratory therapist in an intensive care unit. He is having problems with sleep, concentration, appetite, as well as nervousness, muscle tension, [and] bouts of severe sadness.

(AR 36.)

Dr. Cook prescribed medications for depression and anxiety, and reported that Fretta would investigate psychotherapy. (AR 36, 39.)

Fretta followed up with Dr. Cook on May 29, 2008. Dr. Cook's office notes indicate that Fretta reported "still having severe, debilitating levels of depression and anxiety." (AR 50.) Dr. Cook altered his prescriptions and referred him to psychiatrist Dr. Lorri Szostak.

In Dr. Szostak's Initial Psychiatric Assessment, completed June 30, 2008, she noted the following symptoms of depression: depressed mood, insomnia, anhedonia, anxiety, fatigue, hopelessness, low energy, low concentration, tears, a racing mind, and an inability to set priorities. (AR 53.) Her mental status exam showed slightly pressured speech, anxious and depressed mood, and an anxious and tearful affect, although his thought process, cognition, insight and judgment were essentially normal. (AR 57.) Dr. Szostak diagnosed anxiety and depression exacerbated by severe stressors in his life, that significantly affected his level of functioning.[1] (AR 58.) She concluded that Fretta was "disabled from work at present [un]til anxiety/depression remitted due to poor conc[entration], focus and scatteredness," and noted the need for a follow-up in two to three weeks. (AR 58.)

Dr. Szostak next saw Fretta on July 22, 2008. Although the symptoms of depression had lessened somewhat, the symptoms of anxiety remained unabated. Fretta's son was receiving radiation treatment in Boston. Dr. Szostak concluded that Fretta still lacked the ability to return to work. (AR 69.) Dr. Szostak noted that Fretta reported "miserable concentration," that he couldn't "focus on anything more than 10 minutes" and had "no patience." (AR 69.) Dr. Szostak adjusted Fretta's medications and recommended a follow-up in four to six weeks. (AR 69.) Fretta did not see Dr. Szostak again for approximate-

---

1. Dr. Szostak's diagnosis, according to the Diagnostic and Statistical Manual of Mental Disorders, was Axis I: Anxiety Disorder not otherwise specified; Depression not otherwise specified; Axis IV: severe; Axis V: one month 55; one year 80. (AR 58.)

ly two months, although he did renew his prescriptions. (AR 80.)

## II. Fretta's Short–Term Disability Claim

RRMC's Policy states that short-term disability benefits "will be paid for the period of Disability if the Covered Person gives . . . proof of continued: 1) Disability; 2) Regular Attendance of a Physician; and 3) Appropriate Available Treatment." (Policy 21). With respect to short-term disability, the Policy defines "Disability" to mean "the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Job." (Policy 8).

Fretta applied for short term disability on April 18, 2008. (AR 8.) Liberty Life wrote to Fretta and to Dr. Cook on April 22 requesting medical information and any other documentation that would support his claim for disability benefits. (AR 29–30, 32.) Fretta's letter gave him a deadline of June 5, 2008 to supply proof of disability, and encouraged him to submit the information as soon as possible. (AR 29.)

Liberty Life received Dr. Cook's treatment notes from April 17 and April 30, the depression and anxiety test scores, and the Functional Mental Status Evaluation. From RRMC it obtained Dr. Cook's Medical Examination Certification Report and a job description for the RT position. According to the position summary,

> The Respiratory Therapist is responsible for the coordination and provision of direct patient care, setting up and operating various types of respiratory therapy equipment to be utilized in the diagnosis and treatment of respiratory disease and/or illness. Ability to institute and maintain life saving measures is required.

(AR 23.) With respect to the level of difficulty that the RT job entails and the type and extent of problem-solving required, the position description specified that the RT must be able to

> handle multiple tasks and prioritize to assure efficient, effective and safe delivery of services[;] respond[ ] effectively in emergency and life supporting situations in all age groups and areas[;] . . . make complete and accurate patient assessments on an ongoing basis[;] . . . analyz[e] data as it pertains to patient case status and implement[ ]/suggest[ ] interventions[; and] . . . work independently.

(AR 27.) The position description also stated that the RT is "[d]irectly responsible for the provision of quality patient care," and "[p]atient safety and well being is greatly impacted by the care of the respiratory therapist in a life threatening medical condition." (AR 28.)

Liberty Life denied Fretta's short term disability claim in a letter dated May 13, 2008. (AR 47–49.) Liberty Life compared the medical information it received from Dr. Cook on the two occasions he had seen Fretta with Fretta's job requirements, and concluded:

> the medical documentation does not support restrictions and limitations. . . . [Y]our situational symptoms do not support the criteria for a diagnosis of major depression and do not support an inability to sustain interpersonal communications, make complex decisions, or follow complex directions. While we understand that you experience symptoms associated with your condition, the medical documentation does not support that your condition is of a nature and severity to support work incapacity.

(AR 48.)

The letter selectively quoted from the summary description of Fretta's position, for example omitting any acknowledgment of the necessity for emergency response or

of the critical nature of the role of the RT in life-threatening medical situations. The letter merely stated: "Your job as a respiratory therapist requires that you coordinate direct patient care. You are required to set up and operate various types of respiratory equipment to be utilized in the diagnosis and treatment of respiratory disease and illness." (AR 48.)

Fretta timely requested a review of the denial of short-term disability benefits, and submitted additional medical information from his visit with Dr. Szostak on June 30, 2008. Liberty Life's appeal review unit upheld the denial. In a letter to Fretta dated August 27, 2008, Liberty Life stated that "the conclusion of the medical review indicated that the medical evidence received on appeal does not support impairment that would preclude you from working." (AR 74.)

Fretta learned that his claim file did not include documentation of his May 29 office visit with Dr. Cook, and he requested an additional medical review, to which Liberty Life agreed. (AR 2.) Liberty Life referred the claim to Behavioral Medical Interventions ("BMI") for peer review. Dr. Leonard Hertzberg of BMI reviewed Fretta's file, which included Dr. Cook's and Dr. Szostak's records through July 22, and Fretta's job description. He also spoke with Drs. Cook and Szostak. As of September 22, Dr. Cook had not seen Fretta since April. As of September 23, Dr. Szostak had not seen Fretta since July 22. Both doctors could not comment on his current state of impairment. (AR 79–80.)

Dr. Hertzberg agreed with Fretta's diagnosis, but did not find medical documentation of impaired psychological functioning. (AR 82–83.) Based on Dr. Hertzberg's evaluation, Liberty Life again denied Fretta short-term disability benefits on October 2, 2008. (AR 94–97.) As grounds for the denial, Liberty Life stated: "In the absence of clinical evidence that supports a level of impairment that would have prevented you from performing the duties of your job, you do not meet the definition of disability as stated in the [Policy]." (AR 96.) Thus, at each stage of reviewing his claim, Liberty Life denied Fretta's claim because in its view he did not meet the Policy's definition of disability. Fretta filed this civil suit on February 2, 2009, pursuant to 29 U.S.C. § 1132(a)(1)(B).

### Discussion

I. Standards and Scope of Review

For a party to prevail when cross-motions for summary judgment have been filed, " 'the parties' submissions [must] show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.' " *Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 82 (2d Cir.2009) (quoting *Fay v. Oxford Health Plan*, 287 F.3d 96, 103 (2d Cir. 2002)).

 Where an employee benefit plan grants the plan administrator discretionary authority to determine eligibility for benefits, a court reviews the administrator's decisions for abuse of discretion. *McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 130 (2d Cir.2008) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)).[2] Thus, Liberty Life's decision to deny short-term disability benefits will

---

**2.** The Policy makes clear that Liberty Life has the discretionary authority to determine eligibility for benefits and to interpret the plan's terms: "Liberty shall possess the authority, in its sole discretion, to construe the terms of this policy and determine benefit eligibility hereunder. Liberty's decisions regarding construction of the terms of this policy and benefit eligibility shall be conclusive and binding. (Policy 51.)

be upheld "unless it is 'arbitrary and capricious,'" that is, "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Pagan v. NYNEX Pension Plan,* 52 F.3d 438, 441, 442 (2d Cir.1995) (quotation marks omitted).

■ If a claims administrator has a conflict of interest as both the claim evaluator and the claim payor, the Court takes this conflict into account when reviewing a benefits determination for abuse of discretion. *Metro. Life Ins. Co. v. Glenn,* 554 U.S. 105, 128 S.Ct. 2343, 2350, 171 L.Ed.2d 299 (2008); *accord Hobson,* 574 F.3d at 82. Because Liberty Life both evaluates and pays benefit claims, it has a conflict of interest.

Yet, as the United States Supreme Court observed in *Glenn,* the existence of this conflict of interest is simply a factor to be weighed along with other factors:

> The conflict of interest at issue here, for example, should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration. It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

*Glenn,* 128 S.Ct. at 2351 (citation omitted).

■ Fretta has not produced any evidence to date that suggests that Liberty Life's structural conflict of interest is entitled to significant weight in his case, nor

does his claim record appear to disclose either bias or accuracy in connection with Liberty Life's claims assessment in general. The Court therefore does not accord Liberty Life's conflict of interest any particular weight on this review. *See Hobson,* 574 F.3d at 83; *see also Cusson v. Liberty Life Assur. Co. of Boston,* 592 F.3d 215, 224–25 (1st Cir.2010) (discussing court's obligation "'to inquire into what steps a plan administrator has taken to insulate the decisionmaking process against the potentially pernicious effects of structural conflicts'") (quoting *Denmark v. Liberty Life Assur. Co. of Boston,* 566 F.3d 1, 9 (1st Cir.2009)).

■ This Court's "review under the arbitrary and capricious standard is limited to the administrative record." *Miller v. United Welfare Fund,* 72 F.3d 1066, 1071 (2d Cir.1995). The Court will therefore not consider evidence that was not before Liberty Life in determining whether its decision to deny short-term disability benefits was arbitrary and capricious.

## II. Application of the Arbitrary and Capricious Standard to Fretta's Claim Denial

Fretta argues that Liberty Life ignored Dr. Cook's and Dr. Szostak's diagnosis; emphasized facts that arguably supported his ability to work and ignored facts that supported a disability determination; and erroneously concluded that he was not in ongoing and regular treatment.

Liberty Life did not ignore Fretta's physicians' diagnoses; Liberty Life's consultant Dr. Hertzberg agreed that Fretta's symptoms met the diagnoses. The claim was ultimately denied because Liberty Life concluded that the medical documentation in Fretta's file did not support a level of impairment that would preclude Fretta from performing his duties as an RT. (AR 96.)

Fretta argues vigorously that the medical documentation in the claim file supports a finding of short-term disability, citing his doctors' observations of his presenting symptoms and their diagnoses. Liberty Life argues just as vigorously that a careful and thorough review of the claim demonstrated that Fretta was not disabled under the terms of the Policy.

The key to a finding of disability under the terms of the Policy is evidence that "the Covered Person ... is unable to perform the Material and Substantial Duties of his Own Job." (Policy 8.) Fretta's evidence supports his diagnoses, and supports the conclusion that he was experiencing some degree of impairment. Indeed, his doctors concluded that as a result he was incapable of doing his job.

■ Liberty Life's review of the evidence does not dispute the diagnoses or the observed impairment. Instead, Liberty Life's reviewers decided that Fretta's level of impairment did not preclude him from performing the material and substantial duties of his job. The claim file, however, is devoid of any evidence that Liberty Life made any attempt to ascertain whether impaired concentration, fatigue, difficulty setting priorities, impatience and irritability, among other symptoms, rendered Fretta unable to "institute and maintain life saving measures," "respond effectively in emergency ... situations," or "work independently," for example. Most importantly, the claim file does not indicate whether or how Fretta's level of impairment affected the critical aspect of his job, as detailed in RRMC's job description: assuring "patient safety and well-being ... in a life-threatening medical condition."

Instead Liberty Life apparently ignored RRMC's detailed job description, that described the level of difficulty and the extent of problem-solving required to perform the work of an RT. Rather than seek additional information from his doctors, or from an independent examination, or from RRMC to determine whether Fretta's impairment was severe enough to preclude him from performing these essential job duties, Liberty Life simply relied on an excerpt of the job description and reiterated a reflexive conclusion that the medical evidence did not support impairment that would preclude Fretta from working at his job. (AR 48, 74.)

Dr. Hertzberg was asked to verify Fretta's diagnosis, which he did. He was then asked to describe Fretta's impairments. Dr. Hertzberg concluded that no psychological impairment appeared from the documents he reviewed; one, because Dr. Cook had not corroborated that Fretta's symptoms of depression and anxiety affected his functioning, and two, because Fretta had not followed up with Dr. Szostak for almost two months.

Dr. Hertzberg's first reason is flatly contradicted by the record. Dr. Cook certified that Fretta's condition substantially limited his ability to care for himself or to work. (AR 19.) He stated that Fretta was having difficulty focusing or finishing tasks and was afraid of making mistakes. (AR 38.) In Dr. Cook's opinion, Fretta retained minimal functional abilities and could not currently perform his job. (AR 38.) Dr. Hertzberg may have disagreed with Dr. Cook's assessment, but he could not reasonably have concluded that Dr. Cook's assessment failed to validate Fretta's impaired functioning. *See, e.g., Willcox v. Liberty Life Assur. Co. of Boston,* 552 F.3d 693, 701 (8th Cir.2009) (holding that it was an abuse of discretion for Liberty Life to rely on peer review physician's demonstrably incorrect conclusion that claimant's medical records lacked objective evidence supporting her diagnosis).

Dr. Hertzberg's second reason, that Dr. Szostak had not seen Fretta since late July 2008, has little bearing on whether Fretta was psychologically impaired on April 18, 2008, his disability onset date. Although Dr. Szostak told Dr. Hertzberg in late September 2008 that she therefore could not opine on Fretta's current mental health, the record indisputably reflects her conclusion in late June that Fretta was disabled from work at that time due to poor concentration, scatteredness and inability to focus. (AR 58.) Again, Dr. Hertzberg may have disagreed with Dr. Szostak's assessment, but he could not reasonably have concluded that her assessment failed to validate Fretta's impaired functioning.

■■■ A "wholesale embrace of one medical report supporting a claim denial to the detriment of a contrary report that favors granting benefits" is "indicative of an administrator's abuse of discretion." *McCauley*, 551 F.3d at 136–37. Although a plan administrator "need not accord the insured's treating physician greater deference than a plan's retained physician," it "may not arbitrarily refuse to credit the reliable evidence put forth by a claimant." *Demirovic v. Build. Serv. 32 B–J Pension Fund*, 467 F.3d 208, 212 (2d Cir.2006) (internal quotation marks omitted). Liberty Life's disregard of two medical reports, in favor of a contrary report based solely on a records review, demonstrates abuse of discretion. Given the record before Liberty Life, including the full details of Fretta's job description; including Fretta's doctors' objective assessments of his psychological impairment; and including the

dearth of any evidence that Fretta could in fact carry out the material and substantial duties of his job given his symptoms; the denial of his claim was arbitrary and capricious as unsupported by substantial evidence.

The evidence in the record does not conclusively show that Fretta is entitled to short-term disability benefits, however. Remand is therefore required "with instructions to consider additional evidence...." *Miller*, 72 F.3d at 1071. The administrative record lacks evidence that Fretta's documented symptoms of anxiety and depression rendered him unable to perform specific material and substantial duties of his job, as detailed in his job description. Fretta's doctors' notes and bare conclusions do not prove this critical issue. It is possible that, upon a more complete record, Liberty Life will find substantial evidence upon which to deny the claim.

■■■ On remand for reconsideration of the denial of short-term disability benefits, both Fretta and Liberty Life may supplement the record. Specifically, Fretta may present evidence of his ongoing and continuous treatment during the relevant time period, and his Social Security disability award;[3] either party may offer details of the job requirements for an RT at RRMC, or additional medical evidence that bears on the claim. Liberty Life shall complete its review and processing of Fretta's claim within 180 days of the date of this decision, following which Fretta may again seek review in this Court if necessary. Should Fretta again seek to argue that Liberty

---

**3.** The Social Security Administration ("SSA") issued Fretta a Notice of Award of monthly disability benefits on March 28, 2009. The SSA determined that he became disabled as of January 24, 2008. Whether or not the SSA's definition of "disability" matches the definition in the Policy, Fretta may argue that

the SSA's disability determination is a relevant factor in deciding his claim. *See Hobson*, 574 F.3d at 91–92 (discussing Sixth Circuit's opinion that an award of social security disability benefits is a relevant factor in determining whether a claimant is disabled under an ERISA plan).

Life's conflict of interest exerted a significant influence on its benefits decision in his case, he may present evidence of Liberty Life's bias, such as rate of claims denials, business relationships with the providers of peer review or independent medical opinions, or financial incentives for employees, for example. In turn, Liberty Life may present evidence that its conflict of interest did not influence its decision-making process.

### Conclusion

Liberty Life's denial of Fretta's claim for short-term disability benefits was unsupported by substantial evidence and therefore arbitrary and capricious. Liberty Life's Motion for Summary Judgment (Doc. 12) is **denied.** Fretta's Cross–Motion for Summary Judgment (Doc. 14) is **granted in part and denied in part.** Liberty Life's denial of Fretta's claim for short-term disability benefits is overruled, and the case is remanded for further proceedings consistent with this opinion. The Court will retain jurisdiction over the case.