10-1433-cv
O'Hara v. National Union Fire Ins. Co. of Pittsburgh, PA

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

———————————————————

August Term, 2010

(Argued: February 15, 2011                    Decided: April 14, 2011)

———————————————————

PATRICIA O'HARA,

*Plaintiff-Appellant*,

No. 10-1433-cv

v.

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA,

*Defendant-Appellee*.

———————————————————

CABRANES, POOLER, and CHIN, *Circuit Judges.*

———————————————————

Plaintiff-Appellant Patricia O'Hara appeals from a judgment of the United States District Court for the Western District of New York (Larimer, *J.*) granting summary judgment to Defendant-Appellee National Union Fire Insurance Company of Pittsburgh, PA ("National Union") and dismissing O'Hara's claim for disability benefits under the Employee Retirement Income Security Act of 1974 ("ERISA"). We hold that (1) O'Hara's presence at work does not preclude her from showing that she was disabled during that period; and (2) a reasonable factfinder could conclude that O'Hara was disabled within the meaning of National Union's plan. Accordingly, we vacate the district court's judgment and remand the case for further proceedings.

Nira T. Kersmisch, Sudbury, MA, *for Plaintiff-Appellant*.

Mark A. Molloy and Joseph A. Carello (*on the brief*),

Nixon Peabody LLP, Buffalo, NY, *for Defendant-Appellee*.

_____

POOLER, *Circuit Judge*:

Plaintiff-Appellant Patricia O'Hara appeals from a judgment of the United States District Court for the Western District of New York (Larimer, *J.*) granting summary judgment to Defendant-Appellee National Union Fire Insurance Company of Pittsburgh, PA ("National Union") and dismissing O'Hara's claim for disability benefits under the Employee Retirement Income Security Act of 1974 ("ERISA"). National Union argues that O'Hara cannot recover disability benefits because she was present at work during the period of alleged disability. We disagree. O'Hara presented evidence that she was disabled during all periods required by National Union's plan, and based on such evidence, a reasonable factfinder could conclude that O'Hara was entitled to disability benefits. Therefore, we vacate the district court's judgment and remand for further proceedings.

**I.**

**A.**

In 1993, ITT Flygt Corporation ("ITT") hired Patricia O'Hara as an office administrator. O'Hara had over 20 years of experience in office administration and management. During her employment, O'Hara participated in a voluntary disability insurance plan held by ITT and issued by National Union ("the plan" or "the National Union plan"). Under the plan, O'Hara was eligible to recover insurance proceeds if, as a result of an accidental injury, she was totally and permanently disabled and prevented from engaging in "each and every occupation or employment . . . for which [she was] reasonably qualified by reason of [her] education, training

or experience" ("qualified work") within one year of the accident, and such disability continued for a year.

On March 15, 2001, while working in ITT's Rochester, New York office, O'Hara tripped and fell, striking her head on the floor. She was taken to the emergency room, where she complained of headaches.

After the accident, O'Hara continued to work at ITT. By July 2001, three of O'Hara's coworkers had complained to her supervisor that she was behaving unprofessionally and had difficulty maintaining satisfactory working relationships with colleagues. O'Hara's supervisor found the complaints credible and discussed them with O'Hara, warning her that if she did not act in a professional manner, "[ITT] may have to terminate your employment with the company." On June 6, 2002, ITT fired O'Hara because of her "performance and dealings, interactions, etc. with [ITT] employees."

**B.**

After her fall in March 2001, O'Hara initially was treated by a neurologist, Dr. Tim Counihan. O'Hara took several medications prescribed by Dr. Counihan but reported that they did not alleviate her persistent headaches. In October 2001, O'Hara's internist, Dr. David Sischy, referred her to a different neurologist, Dr. Joseph Mann. After Dr. Mann examined O'Hara on October 8, 2001, he wrote to O'Hara's internist with his initial diagnosis. Dr. Mann stated that O'Hara was being evaluated for headaches that "were associated with a decrease in executive function, mood changes, and sleep disorder." Dr. Mann noted that O'Hara had "daily" headaches that "seem[ed] to encircle the head" and could "worsen as the day goes on." Dr.

Mann concluded that "[m]y feeling at this point is that the patient has a posttraumatic headache disorder associated with problems with executive function, mood, and sleep."

Dr. Mann continued treating O'Hara and sending written reports to Dr. Sischy. After an examination on February 14, 2002, Dr. Mann wrote that O'Hara "needs a nap" during many days and had to "constantly mak[e] notes at work and at home" to remember her tasks. Dr. Mann concluded that O'Hara "still has a post-traumatic headache disorder with memory disturbance." Dr. Mann examined O'Hara again on March 14, 2002, less than one year after her March 15, 2001 injury. After this examination, Dr. Mann wrote that O'Hara "continues to have chronic daily headaches, insomnia, and also complains of pain involving her upper arms." Dr. Mann described the headaches as "mostly posterior," containing "migrainous components." Dr. Mann concluded that O'Hara continued to have "memory disturbance" and that "[a]t this point, it appears that [O'Hara] continues with a post-traumatic headache disorder which she's now had for a year."

## C.

A year after her injury, O'Hara continued seeking treatment from Dr. Mann. Over the course of O'Hara's second year after her injury, Dr. Mann examined O'Hara at least six times. In July 2002, Dr. Mann noted that O'Hara was "completely disabled," "unable to work," and "continue[d] to be in severe pain intolerant of medications." In August 2002, Dr. Mann again diagnosed O'Hara as suffering "a post traumatic headache disorder with sleep disturbance, memory disturbance, cognitive problems and chronic pain involving her neck and upper back area." In November and December 2002, Dr. Mann stated that O'Hara remained "totally disabled." In January 2003, Dr. Mann wrote that "[t]here has been no major change in

-4-

[O'Hara's] headache pattern," as she continued to have "chronic daily headaches." On March 14, 2003, Dr. Mann prescribed to O'Hara treatment used for patients with "intractable chronic daily headache[s]."

In mid-2002, while she was receiving treatment from Dr. Mann, O'Hara began treatment with a pain management specialist, Dr. Jaimala Thanik, whom Dr. Mann recommended. After the initial examination, Dr. Thanik concluded that "[O'Hara's] pain problem is definitely post traumatic headaches" and diagnosed the headaches as "[m]uscle contraction headaches with a component of occipital neuralgia." In February 2003, Dr. Thanik noted that "[O'Hara's] symptoms remain about the same. Nothing seems to have worked for her. . . . She will continue working with Dr. Mann on headache management and see Dr. Kuttner for depression."

In late 2002 and early 2003, two doctors examined O'Hara for purposes of her New York workers' compensation claim. Dr. Guy Corkill, a neurosurgeon, examined O'Hara on three occasions beginning in September 2002 and concluded in July 2003 that O'Hara had a "[m]ild temporary and partial" disability arising from the accident. In addition, Dr. Thomas Letourneau, a neurologist, examined O'Hara in March 2003 and stated that although O'Hara was suffering from mild/moderate depression stemming from chronic pain, "[t]here is no psychiatric disability [causing her depression]. From a psychiatric standpoint, she is able to return to work full-time." The New York State Workers' Compensation Board ultimately granted O'Hara disability benefits.

In April 2003, more than two years after O'Hara's accident, pain specialist Dr. Thanik recommended that O'Hara join a fitness center "for daily exercises, especially swimming, walking, etc.," and noted that "I also have suggested that she may try going back to work doing

half days with restrictions of no repetitive type work." In May 2003, Dr. Thanik noted that "[t]he patient continues to have constant pain."

**D.**

On January 29, 2004, O'Hara submitted a claim for disability benefits under the National Union disability plan. AIG Domestic Claims, Inc. ("AIG") processed O'Hara's claims and reviewed O'Hara's medical records and workers' compensation medical reports.

At AIG's request, Dr. David Marzulo, a neurologist, examined O'Hara on September 12, 2005. After the examination, Dr. Marzulo stated that given the probability that O'Hara's continued employment in her present position would be marred by "deficiencies in recalling conversations, verbal transactions, and other minute to minute and hour to hour activities in a busy office setting," he did not "feel that she can perform her pre-injury occupation." Moreover, Dr. Marzulo observed that "[O'Hara's] disability was present from March 15, 2001," the date of the accident. However, Dr. Marzulo felt this was "a partial disability" and that "[a] low emotional stress job duty which would not necessitate a multitude of recall actions or marked responsibility on the part of the claimant I feel could be initiated on a part time basis ie. up to 20 hours per week initially as a so-called testing ground."

On January 6, 2006, AIG denied O'Hara's claim for benefits, stating that "while there is proof that [O'Hara was] disabled from [her] own job, there is [a] lack of objective medical evidence showing [disability] from any employment." AIG concluded that "there is neither proof of a generalized inability to work nor have any of [O'Hara's] doctors actually opined that [her] disability is permanent, as required by the policy."

On March 3, 2006, O'Hara appealed and on April 17, 2006 AIG requested that O'Hara "provide documentation that substantiates the information that you have presented in your letter." In response, O'Hara submitted a June 28, 2006 letter from Dr. Mann. In the letter, Dr. Mann wrote that "[i]mmediately after [O'Hara's March 15, 2001 injury], and continuously, she was disabled because of posttraumatic migrainous headache disorder with chronic daily headache pattern." Moreover, Dr. Mann stated that O'Hara had "developed a posttraumatic stress disorder with depression." Dr. Mann concluded that:

> [O'Hara] was totally disabled and prevented from engaging in each and every occupation or employment for compensation or profit that she was reasonably qualified for within 1 year of the March 15, 2001 fall.

On November 13, 2006, National Union's ERISA Appeal Committee denied O'Hara's claim. The Committee informed O'Hara that there was not "sufficient evidence that you were totally and permanently disabled and prevented from engaging in each and every occupation or employment for compensation or profit for which you were reasonably qualified by reason of your education, training, and experience within one year of your March 15, 2001 fall."

On March 18, 2008, O'Hara filed suit against National Union in the Western District of New York, alleging that National Union violated ERISA by denying her disability benefits. About a year later, National Union moved for summary judgment. On March 23, 2010, the district court granted National Union's motion. *O'Hara v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 697 F. Supp. 2d 474 (W.D.N.Y. 2010).

First, the district court considered whether O'Hara's notice of claim was untimely. Under the plan, a notice of claim must be submitted "within twenty days after the occurrence or commencement of any loss covered by [the] policy, or as soon thereafter as is reasonably

possible." *Id.* at 478 (emphasis omitted). Although O'Hara filed her claim on January 29, 2004 – well outside the twenty-day window specified in the plan – the district court concluded that because National Union "never objected to the timeliness of O'Hara's claim, or suggested anywhere that her notice of claim had not been filed 'as soon as [was] reasonably possible' in light of the nature and progression of O'Hara's disability," it had waived that defense. *Id.* (citing *Shutts v. First Unum Life Ins. Co. of Am.*, 310 F. Supp. 2d 489, 494 (N.D.N.Y. 2004) (phrase "as soon as is reasonably possible" creates an exception for those who cannot file a proof of claim within the designated number of days, and thus failure to timely file proof of loss does not expand the policy and may be waived)).

Second, the district court reviewed, on a motion for summary judgment, National Union's denial of benefits. Because the plan does not give the plan administrator discretionary authority to determine benefits, the district court stated that it could review "all aspects of the administrator's eligibility determination, including fact issues, de novo." *O'Hara*, 697 F. Supp. 2d at 476 (brackets and internal quotation marks omitted). The district court further stated that it "possess[ed] the authority to weigh competing physician opinions [itself], and to make findings of fact based on [its] own consideration of the evidence." *Id.* (internal quotation marks omitted).

Applying this standard of review, the district court found that:

> the denial of O'Hara's application for disability benefits was based on sufficient evidence, because there is no credible proof that O'Hara suffered from a permanent and total disability which "commenc[ed] within one year of the date of the accident."

*Id.* at 478-79. The district court stated that:

> To the extent that O'Hara purports to rely on Dr. Mann's June 28, 2006 letter opining that O'Hara became totally disabled in the year following her accident, I find that this letter, which contains no

-8-

analysis whatsoever, is unsupported by any medical or other evidence, and in fact, is contradicted by other medical evidence in the record.

*Id.* at 480. The district court concluded that National Union's denial of benefits to O'Hara "was correct, and is supported by sufficient evidence of record." *Id.* at 482.

The district court entered judgment on March 26, 2010, and O'Hara timely appealed to this Court.

## II.

### A.

We review de novo a district court's grant of summary judgment in an ERISA action. *Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 82 (2d Cir. 2009). Summary judgment is appropriate only if, after drawing all permissible factual inferences in favor of the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 113 (2d Cir. 2011). That is, summary judgment is warranted when "the moving party shows that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law." *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003); *see* Fed. R. Civ. P. 56(c).

Although there is no right to a jury trial in a suit brought to recover ERISA benefits, *see, e.g.*, *Tischmann v. ITT/Sheraton Corp.*, 145 F.3d 561, 568 (2d Cir. 1998), and thus the district court would have been the factfinder at trial, the district court's task on a summary judgment motion – even in a nonjury case – is to determine whether genuine issues of material fact exist for trial, not to make findings of fact. *See, e.g.*, *Vona v. Cnty. of Niagara*, 119 F.3d 201, 205 n.4 (2d Cir. 1997). Sometimes in ERISA cases parties make a "motion for judgment on the

administrative record," which we have observed is "a motion that does not appear to be authorized in the Federal Rules of Civil Procedure." *Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 124 (2d Cir. 2003). If such a motion is treated as a summary judgment motion, the district court must limit its inquiry to determining whether questions of fact exist for trial. *Id.* In some circumstances, it may be appropriate for the district court to treat such a motion as requesting "essentially a bench trial 'on the papers' with the District Court acting as the finder of fact." *Id.* In that scenario, the district court may make factual findings, but it must be clear that the parties consent to a bench trial on the parties' submissions, *see Burke v. PriceWaterHouseCoopers LLP, Long Term Disability Plan*, 537 F. Supp. 2d 546, 548 (S.D.N.Y. 2008) (parties consented to "summary trial" on stipulated administrative record, waiving right to call witnesses), *aff'd*, 572 F.3d 76, 78 (2d Cir. 2009), and the district court must "make explicit findings of fact and conclusions of law" pursuant to Federal Rule of Civil Procedure 52(a). *Muller*, 341 F.3d at 124.

Here, the parties did not stipulate to a "summary trial" or a "bench trial 'on the papers,'" and thus the district court was obliged to proceed in traditional summary judgment fashion.

**B.**

The threshold question is whether the district court correctly applied our well-settled standard of review for summary judgment. We conclude that it did not.

The district court correctly determined that because National Union's plan fails to explicitly vest the plan administrator with "discretionary authority to determine eligibility for benefits," the administrator's denial of benefits is not entitled to deference. *O'Hara*, 697 F. Supp. 2d at 476; *accord Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 245 (2d

-10-

Cir. 1999); *cf. Hobson*, 574 F.3d at 82 ("[Where] written plan documents confer upon a plan administrator the discretionary authority to determine eligibility, we will not disturb the administrator's ultimate conclusion unless it is arbitrary and capricious." (internal quotation marks omitted)). The district court – and this court – therefore review the administrator's determination de novo. *Id.*; *see Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

After reviewing the record, the district court concluded that the plan administrator's decision was supported by "sufficient evidence." *O'Hara*, 697 F. Supp. 2d at 478-79, 482. By applying a "sufficient evidence" standard, the district court was essentially applying deferential rather than de novo review. However, regardless of the district court's standard of review of the plan administrator's denial of benefits, a district court may not grant a motion for summary judgment if the record reveals a dispute over an issue of material fact. The critical question for the district court was whether there was a genuine dispute of material fact, not whether the administrator's decision was supported by sufficient evidence on the merits. *See Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 117 (2d Cir. 2010). That is, a conclusion that the administrator's decision was based on "sufficient evidence" does not entitle National Union to summary judgment if there are issues of material fact in dispute. The district court therefore erred when it observed that its "authority to weigh competing physician opinions . . . and to make findings of fact based on [its] own consideration of the evidence" entitled it to set aside any evidence that would otherwise create a genuine issue of fact. *O'Hara*, 697 F. Supp. 2d at 476.

Accordingly, the district court failed to properly apply the summary judgment standard set forth by this Court. That error requires a remand to the district court for reconsideration in light of the applicable legal standard. *See Davidson v. Chestnut*, 193 F.3d 144, 150-51 (2d Cir. 1999).

## C.

Under the plan, O'Hara is eligible for benefits if:

> as the result of injury and commencing within one year of the date of the accident [she] is totally and permanently disabled and prevented from engaging in each and every occupation and employment for compensation or profit for which [she] is reasonably qualified by reason of [her] education, training or experience . . . [and] such disability has continued for a period of twelve consecutive months and is total, continuous and permanent at the end of this period . . . .

That is, O'Hara is eligible for benefits under the plan if she is totally and permanently disabled from qualified work and that disability commences within one year of the accident and continued for at least one year. For example, if, as a result of an accident on March 15, 2001, O'Hara were totally and permanently disabled from qualified work as of December 1, 2001, she would be eligible for benefits on December 1, 2002. If, on the other hand, she became totally and permanently disabled from qualified work as of March 16, 2002, she would not be eligible for benefits regardless of the length of her disability.

National Union argues that O'Hara cannot make such a showing, and thus summary judgment for National Union was proper. In particular, National Union argues that: (1) O'Hara is ineligible for benefits because she was present at work during a period in which she now claims she was disabled; (2) there is no genuine dispute about whether, within one year of the accident, O'Hara was totally and permanently disabled and prevented from engaging in qualified

-12-

work; and (3) there is no genuine dispute about whether such disability continued for 12 months and was "total, continuous and permanent at the end of this period."[1] We consider these arguments below.

## 1.

National Union argues that because O'Hara "continue[d] to report for work" during a period of disability required for benefits under her plan, O'Hara "cannot simultaneously be deemed 'disabled' for purposes of receiving benefits under an ERISA plan."

National Union claims that our decision in *Kunstenaar v. Conn. Gen. Life Ins. Co.*, 902 F.2d 181 (2d Cir. 1990), supports this proposition. In *Kunstenaar*, an employee reported to work every day during the period of alleged disability, yet did not "present any evidence that he was completely unable to perform his duties while [at work]." *Id.* at 184. The employee "lost no time from work because of his alleged indisposition" and did not consult a doctor until months after his employment was terminated. *Id.* at 182-83. Because the employee did not present "any evidence" that he was disabled while present at work, we affirmed the district court's grant of summary judgment for the insurer. *Id.* at 184-85. Rather than creating a special eligibility requirement for ERISA benefits, the *Kunstenaar* Court simply applied the summary judgment standard to conclude that the employee "could not be considered to have been 'completely prevented' from doing those things which he in fact continued to do." *Id.* at 184 (quoting phrase in relevant plan).

---

[1] The district court found that National Union waived its argument that O'Hara failed to file a timely notice of claim. *O'Hara*, 697 F. Supp. 2d at 478. National Union has not challenged this finding and therefore waives such an argument. *See, e.g.*, *In re Wireless Data, Inc.*, 547 F.3d 484, 492 (2d Cir. 2008) (argument not raised on appeal is waived).

We recently reiterated this understanding of *Kunstenaar*, rejecting an insurer's argument that "an insured who works full time until quitting or being terminated cannot recover benefits, even if allegedly suffering from an illness at the time." *Locher v. Unum Life Ins. Co. of America*, 389 F.3d 288, 297 (2d Cir. 2004). In *Locher*, the employee was diagnosed as suffering from Chronic Fatigue Syndrome and continued working for two and a half years. *Id.* at 291. As her illness gradually worsened, the employee attempted to preserve her energy for work by stopping most activities outside of work and was counseled for numerous unscheduled absences and medical appointments during the work day. *Id.* After trial, the district court found that the employee was disabled on the day she quit her job, although she had continued to report to work while ill. *Id.* at 292-93. This Court affirmed, distinguishing *Kunstenaar* as a case where the claimant "had failed to present 'any evidence' that he met his plan's definition of disability prior to his termination from employment, when his coverage under the plan at issue ended." *Id.* at 297 (quoting *Kunstenaar*, 902 F.2d at 184). We concluded that the employee in *Locher*, by contrast, presented sufficient evidence that she was disabled, despite her presence at work. *Id.* at 297.

In sum, neither *Kunstenaar* nor *Locher* stands for the blanket rule that an employee, as a matter of law, cannot be disabled when she is present at work. One may be at one's place of employment but not able to work. An employee's continued presence at her place of employment does not preclude a finding of disability when there is evidence that the employee is incapable of performing her job. If there is a genuine dispute about whether the employee was disabled, this question is for the factfinder.

-14-

Here, O'Hara reported to work until she was fired on June 6, 2002 – almost 15 months after her accident – and now argues that she was disabled within 12 months of her accident. Pursuant to *Kunstenaar* and *Locher*, we must determine whether O'Hara presented evidence from which a reasonable factfinder could conclude that she was disabled within the meaning of the National Union plan.

**2.**

National Union argues that no reasonable factfinder could determine that, as of March 15, 2002, O'Hara was totally and permanently disabled from engaging in qualified work.

Both parties agree that under the explicit terms of the plan, O'Hara need not be totally and permanently disabled from engaging in every occupation providing any compensation. Rather, O'Hara need only be totally and permanently disabled from engaging in "each and every occupation and employment for compensation or profit for which [she] is reasonably qualified by reason of [her] education, training or experience." Under this plan, O'Hara is ineligible for benefits if, at any point within two years of her accident, she could engage in occupations or employment "rising to the dignity of an income or livelihood" and for which she was reasonably qualified. *See Demirovic v. Bldg. Serv. 32 B-J Pension Fund*, 467 F.3d 208, 215 (2d Cir. 2006) (interpreting phrase "any gainful employment" in light of the purposes of ERISA).

O'Hara claims that, within one year of her accident, her head injury totally and permanently disabled her from engaging in any occupation rising to the dignity of an income or livelihood – much less an occupation for which she was reasonably qualified. In June 2006, Dr. Mann affirmed that O'Hara was totally disabled from qualified work "within 1 year of the March 15, 2001 fall." Dr. Mann's contemporaneous notes indicate that within a year of her accident,

-15-

O'Hara "ha[d] a post-traumatic headache disorder with memory disturbance." As the district court observed, the record contains "substantial evidence" that "the onset and intensification of impaired executive functions stemming from her fall . . . caused her to be disabled from her job as an administrative assistant at ITT on or before March 15, 2002." *O'Hara*, 697 F. Supp. 2d at 479. In addition, O'Hara presented evidence that her "chronic daily headaches" and memory disturbance prevented her from engaging in other work. The district court concluded that, by July 2001 and continuing thereafter, O'Hara had "a marked inability to get along with her own coworkers" and such deficiency was "both pronounced and significant." *Id.* at 479-80. By July 2001, O'Hara's supervisor had "significant questions" about her ability to productively interact and work with her colleagues. A reasonable factfinder could conclude that, within a year of her accident, O'Hara's head injury prevented her from successfully interacting with others in a work environment. In sum, there is a genuine dispute that O'Hara was totally and permanently disabled from engaging in qualified work as of March 15, 2002.

National Union disagrees with such a conclusion and principally objects to any reliance on Dr. Mann's June 2006 letter stating that O'Hara had been totally disabled from qualified work "within 1 year of the March 15, 2001 fall." National Union emphasizes that Dr. Mann did not state by March 15, 2002 that O'Hara was totally and permanently disabled from qualified work. However, the plan does not require such a statement by March 15, 2002. Dr. Mann's June 2006 opinion was supported by numerous contemporaneous letters and medical notes, from which a reasonable factfinder could conclude that O'Hara was totally and permanently disabled from qualified work by March 15, 2002. Moreover, Dr. Mann's June 2006 opinion is not irreconcilable with his December 2002 statement that O'Hara was disabled from performing "the

-16-

type of work that she was doing." O'Hara could have been disabled from both the work she was doing and other work for which she was qualified. A reasonable factfinder could weigh Dr. Mann's 2006 opinion about O'Hara's condition within one year of her fall with the other evidence of O'Hara's condition, and could find that Dr. Mann's 2006 opinion was credible and correct.

In sum, there is a genuine dispute regarding whether O'Hara was totally and permanently disabled from qualified work within a year after her accident.

**3.**

Lastly, National Union argues that there is no genuine dispute about whether O'Hara remained totally and permanently disabled from qualified work "for a period of twelve consecutive months." We disagree. A reasonable factfinder could conclude that Dr. Mann's diagnoses were consistent from his first examination of O'Hara in October 2001 until his letter to National Union in June 2006. During this period, Dr. Mann noted that O'Hara continued to suffer from "daily headaches that build up as the day progresses" and he concluded that O'Hara was "totally disabled from employment." In November and December 2002, Dr. Mann stated that O'Hara "remains totally disabled" and in January 2003 he saw "no major change in her headache pattern," as she continued to have "chronic daily headaches," for which he could not "see a ready explanation." On March 14, 2003, Dr. Mann prescribed to O'Hara treatment used for patients with "intractable chronic daily headache[s]."

Despite this evidence, National Union argues that four doctors disputed Dr. Mann's opinion that O'Hara could not work, and therefore, no reasonable factfinder could find that, for two years after her accident, O'Hara had remained totally and permanently disabled from

qualified work. O'Hara, in contrast, responds that the other four doctors neither made such a

determination nor dealt with the precise medical issues diagnosed by Dr. Mann. First, in a report

dated March 24, 2003 (shortly after the plan date to determine the status of the injury),

psychiatrist Dr. Letourneau stated that O'Hara "has the type of depression typically associated

with chronic pain, [which] reflects her loss of her previous functional abilities." Dr. Letourneau

concluded that because O'Hara "always cited her headaches, and never her emotional

symptoms" as limiting her, she did not have a "psychiatric disability" and thus "[f]rom a

psychiatric standpoint, she is able to return to work full-time." O'Hara, however, argues not that

she had a psychiatric disability resulting from depression, but a neurological disability resulting

from a head injury. Second, in April 2003, pain specialist Dr. Thanik "suggested that [O'Hara]

may try going back to work doing half days with restrictions of no repetitive type work." Far

from concluding that O'Hara was able to engage in qualified work, Dr. Thanik simply

recommended that exercise may help and that O'Hara "may try" to go back to work, if such

work was suitably restricted and short. Third, in July 2003, neurosurgeon Dr. Corkill stated that

O'Hara had a "mild temporary and partial" disability, and did so only on the cover page of his

report, without explaining in the report why the disability was mild, temporary, and partial.

Lastly, in September 2005, neurologist Dr. Marzulo stated that O'Hara had "a partial disability"

and that "[a] low emotional stress job duty which would not necessitate a multitude of recall

actions or marked responsibility on the part of the claimant I feel could be initiated on a part time

basis ie. up to 20 hours per week initially as a so-called testing ground." Dr. Marzulo did not

conclude that O'Hara was able to engage in qualified work. Rather, he recommended "testing"

O'Hara's abilities to work "on a part time basis" – and to conduct such a test two years after the

-18-

relevant plan date. In sum, National Union has not presented "incontrovertible evidence" that "so utterly discredits" Dr. Mann's evaluation that no reasonable factfinder could accept Dr. Mann's opinion as true. *See Cameron v. City of New York*, 598 F.3d 50, 58 (2d Cir. 2010).

Accordingly, genuine issues exist regarding whether O'Hara remained totally and permanently disabled from qualified work for at least one year starting at some time within the first year after her accident.

## III.

We express no opinion about the ultimate merits of O'Hara's claim. However, because a reasonable factfinder could conclude that O'Hara is entitled to disability benefits under the plan, we vacate the district court's grant of summary judgment to National Union. Irrespective of whether a district court is tasked with reviewing a plan administrator's denial of benefits de novo, a district court may not grant a motion for summary judgment if the record reveals a dispute over an issue of material fact. Because the evidence presented by O'Hara indicates there is such a dispute, the district court erred in granting National Union's motion for summary judgment.

## CONCLUSION

For the foregoing reasons, the district court's judgment is VACATED and the case is REMANDED for further proceedings.