Kristin **BARBER**, Plaintiff,

v.

**SUN LIFE AND HEALTH INSURANCE COMPANY,** Defendant.

Civil No. 3:09CV00163(AVC).

United States District Court, D. Connecticut.

Feb. 13, 2012.

Justin C. Frankel, Jason Newfield, Frankel & Newfield, P.C., Garden City, NY, for Plaintiff.

Stephen P. Brown, Samuel I. Reich, Joshua Bachrach, Wilson, Elser, Moskowitz, Edelman & Dicker, LLP, Philadelphia, PA, for Defendant.

### RULING ON TBS MOTIONS FOR SUMMARY JUDGMENT

ALFRED V. COVELLO, District Judge.

This is an action for long term disability benefit relief in which the plaintiff, Kristen Barber, alleges unlawful denial of her claim for long term disability income by the defendant, Sun Life. It is brought pursuant to ERISA § 502(a)(1)(B).

The plaintiff and the defendant have filed motions for summary judgment, pursuant to Federal Rule of Civil Procedure 56, arguing that there are no genuine disputes as to any material fact and that they are entitled to judgment as a matter of law on all claims. For the reasons that follow the defendant's motion is granted in part

and denied in part and the plaintiff's motion is denied.

## FACTS

An examination of the complaint, pleadings, Local Rule 56 statements, exhibits accompanying the motions for summary judgment, and responses thereto, discloses the following undisputed facts:

Barber was employed by X–Ray Associates, Inc. (X–Ray) as a Director of Marketing until July 17, 2003, with a monthly salary of $10,402.00.

On January 31, 2001, while working for X–Ray Associates, an MRI scan of Barber's brain showed lesions consistent with Multiple Sclerosis ("MS").

In May 2001, Dr. Joseph Guarnaccia began treating Barber. Barber presented symptoms of fatigue, weakness in her ankle and foot, and numbness in her right thigh following a fall on ice in January 2001. Dr. Guarnaccia documented evidence of central nervous system damage and the doctor's "impression was new onset MS."

On April 25, 2002, another MRI of Barber's brain was conducted, revealing "multiple well-defined foci of hyper intense signals in the periventricular white matter, consistent with MS."

On February 6, 2003, Barber reported to Dr. Guarnaccia that she had "difficulty carrying loads of equipment from office to office" and that she had fatigue in the evenings.

On June 16 2003, another MRI was conducted on Barber's brain, again showing results consistent with MS.

In June 2003 and July 2003 meetings with Dr. Guarnaccia, Barber complained of "muscle fatigue in her legs after walking short distances," "pain in the lower extremities, slight paresthesias in her hands and feet," and weak upper extremities, She also complained of decreased endurance in terms of her ability to walk and carry items, numb hands "if she use[d] them for any length of time," spasms, balance problems, urinary frequency, periods of fatigue, and cognitive difficulties. Upon examination, Dr. Guarnaccia documented "abnormal eye movements, impairment of posture on the examination table, weakness of the right arm, clumsy hand coordination, and leg weakness greater on the right."

On July 17, 2003, Dr. Guarnaccia wrote in an office note "[a]t this point, I do not feel that she can continue working." He recommended "that she go on total disability."

On July 18, 2003, Barber stopped working in her regular position as Director of Marketing, and subsequently filed a claim for long term disability benefits to GE Group Life Assurance Company. In connection with the claim, Dr. Guarnaccia completed an Attending Physician's Statement ("APS") which indicated that Barber "suffered from MS, with symptoms of fatigue, leg and arm weakness, spasms, numbness and cognitive dysfunction, which affected her ability to work."

On November 19, 2003, GE Group Life Assurance Company, which later changed its name to Genworth and then Sun Life, through various business acquisitions, approved Barber's claim for long term disability benefits based on the medical reports provided by Dr. Guarnaccia. The long term disability policy defines "Total Disability" as follows; "Total Disability must be caused by Sickness or Injury and must commence while you are insured under the policy. You will be considered totally disabled if you are unable to perform all the material and substantial duties of your regular occupation." The claims certificate states that GE Group Life Assurance Company has "sole and exclusive

discretion and authority to carry out all actions involving claims procedures explained in the Policy."

On December 6, 2003, the Social Security Administration awarded Barber disability benefits, finding her disabled under its rules. Barber began receiving a monthly payment of $1,701.20.

In February 2004, GE requested additional information regarding Barber's disability, including a claimant statement and a physician's statement. In the claimant statement, Barber reported less physical activity and decreased cognitive function. Dr. Guarnaccia's statement noted that Barber "continued to have fatigue, weakness, pain, and cognitive dysfunction due to her MS, and remained significantly impaired."

In September 2004, GE again requested additional information regarding Barber's disability, including a claimant statement and a physician statement. In the claimant statement, Barber notes that her symptoms have worsened. Dr. Guarnaccia stated that Barber continued to suffer from impairments and would never be able to return to work.

Between June 2005 and August 2008, Barber met with Dr. Guarnaccia nine times. Physical examinations during these visits reflected unchanged conditions.

On May 20, 2005, the insurer again requested updated claim documentation. X–Ray's long term disability was now being administered by Genworth Financial Group. In the claimant statement, Barber indicates that she "had worsened cognitive function and increased weakness in her arms and legs." In the physician state-ment, Dr. Guarnaccia noted that Barber continued to suffer from limitations, and could not lift or carry any weight on a regular basis.

On July 28 and 30, 2005, as well as September 6 and 7, 2005, Genworth conducted surveillance of Barber going on errands and having lunch with a friend.

On November 14, 2005, after Genworth requested cognitive testing of Barber, Dr. Guarnaccia submitted a report to Genworth outlining Barber's ongoing complaints of spasms, numbness, fatigue, poor stamina, cognitive complaints, physical limitations, and sleep disturbance. He also noted that Barber took significant medications in an effort to combat her MS that impaired her ability to work.[1]

On December 14, 2005, Genworth referred Barber's file for review, "asking the psychologist to comment on Plaintiff's prognosis and her restrictions and limitations." On December 19, 2005, Dr. James William Pier, Ph.D., provided a three page written report, in which he was critical of Dr. Guarnaccia's decision to not request a neuropsychological evaluation.

On January 4, 2006, Genworth again requested neuropsychological evaluation, following Dr. Pier's review, claiming the testing was necessary to evaluate Barber's prognosis and restrictions.

On February 15, 2006, a Genworth consultant, Dr. Thomas Hicks, concluded that "given the physical requirements of her occupation and the documented fatigue reported by the claimant, it is my opinion that the claimant has a level of impairment that precludes her from performing her own occupation." Genworth then deter-

---

1. The statement read in part, "It is my medical opinion of Ms. Barber that she has progressive functional impairments and is totally disabled. Moreover, she has severely diminished physical functional capacities that it is my medical opinion that Ms. Barber is unable to perform any occupation for which she may be reasonably qualified for based upon her education, training and experience."

mined that Barber continued to qualify for long term disability benefits.

In April 2006, Genworth indicated that "no further [Special Investigation Unit] involvement would be necessary" based on Br. Hicks' finding that the plaintiff remained disabled.

In December 2006 and September 2007, Barber provided Genworth with claimant's statements noting that she suffered from progressive MS with the same symptoms as previously reported. Barber also indicated that she was able to ambulate without assistance, leave her home, and occasionally drive. Dr. Guarnaccia's reports that accompanied the claimant's statements, indicated the same symptoms as previously reported.

In May 2007, Genworth changed its name to Sun Life.[2]

On January 17, 2008, Sun Life referred Barber's claim for an occupational analysis. On January 20, 2008, Sandra Boyd completed the analysis. Boyd reviewed the job description form completed by X–Ray in September 2003, for the position of Director of Business Development. The job description indicated that "Barber spent 75% of her time making sales calls to physician[s], distributing company materials, and promoting services." Additionally, the job description indicated that Barber "spent 25% of the time analyzing statistical data, and up to 5% of the time distributing contrast materials to physicians for examination preparation." The job description indicated that the position also included "physical requirements of lifting and carrying promotional items and walking throughout medical office buildings, metropolitan areas, and individual physician offices."

The Physical Demands Analysis Worksheet ("PDAW") indicated that Barber's occupation required the following; 1) lifting and carrying up to five pounds continuously and up to fifty pounds occasionally; 2) standing for up to four hours a day, and that she be on her feet for up to six hours a day; 3) driving for up to two hours daily, up to one hour at a time; 4) bending at the waist, squatting and reaching below the waist, each for up to one hour; 5) exposure to hazardous machinery, electrical hazards, cluttered floors, x-ray and MRI machines. Boyd spoke with X–Ray regarding Barber's job duties and confirmed the PDAW descriptions.

Boyd explained that the Department of Labor classifies Barber's occupation as light duty and that the physical demands of her job exceed what was typically required of the occupation. Boyd also stated that the job is most consistent with a sales representative of dental and medical equipment and supplies. Based on X–Ray's descriptions of the position, as well as the Department of Labor's dictionary of occupational titles (DOT) description for a sales representative of dental and medical equipment and supplies, Boyd decided to reclassify Barber's position from medium duty to light duty.

From January 21, 2008 through January 23, 2008, Sun Life conducted surveillance of Barber's daily activities. On the first day, surveillance was conducted and Barber was not observed outside of her home. Observations indicated that she was inside her home for the duration of the day, with two visitors entering the home in the afternoon. On the next two days, surveillance only observed Barber having lunch with her sister on each day and driving.

2. Sun Life Financial Inc. acquired Genworth Financial, Inc.'s U.S. Employee Benefits Group.

On February 5, 2008, Sun Life performed additional surveillance on Barber. Sun Life completed 19 hours of surveillance. As a result of this surveillance, Sun Life referred Barber's file to a medical consultant because Dr. Guarnaccia's report was "inconsistent" with both his examination notes and the surveillance documentation.

On March 26, 2008, Dr. William Hall conducted the consultant review. Dr. Hall, who is not a neurologist, reviewed Barber's medical records from June 2005 through January 2008. He stated that he was "not able to explain [the] apparent discrepancy between mildly abnormal neurologic findings . . . and severe and permanent activity restrictions proffered on Ms. Barber's behalf by Joseph Guarnaccia M–D." He went on to explain that he was "not able to identify an absolute or objective medical impediment to Ms. Barber pursuing sustained activity including work at light level of exertion." In responding to additional questions from Sun Life, Dr. Hall stated that the medical records alone suggested that Barber was limited from "prolonged standing, walking, and repetitive lower extremity function." The surveillance video, however, led to the conclusion that Barber was "capable of standing, walking and sitting for six to eight hours daily, using her arms, hands, legs, and feet for ordinary activities and lifting ten pounds frequently and up to twenty pounds occasionally." Dr. Hall did not speak with Barber or Dr. Guarnaccia.

On April 7, 2008 and April 8, 2008, Sun Life conducted a third surveillance session of Barber. On April 7, 2008, surveillance cameras recorded Barber running errands and shopping for groceries. On April 8, 2008, surveillance recorded Barber driving to a restaurant for lunch.

On April 15, 2008, Sun Life referred Barber's claims to MES Solutions for a review of her medical records. On April 21, 2008, a neurologist. Dr. Bruce LeForce, conducted the review. Dr. LeForce has worked as a consultant for numerous medical review companies. Dr. LeForce concluded that Barber could "work full-time in her own occupation which is categorized as light." Sun Life did not provide the specifics of Barber's job requirements Dr. LeForce. He never spoke with Barber or Dr. Guarnaccia.

On April 23, 2008, Sun Life notified Barber by letter that she no longer qualified for benefits. On April 29, 2008, Barber requested a copy of all relevant documentation. On July 31, 2008, Sun Life provided a copy of the surveillance videos and plan documents to Barber.

On October 16, 2008, Barber submitted her appeal of Sun Life's benefit determination. With the appeal, Barber submitted office notes from Dr. Guarnaccia dated May 29, 2008 and August 28, 2008, In the office notes. Dr. Guarnaccia noted that Barber's "condition declined over the past month. She presented with more weakness, particularly in the right leg, and worsening balance—she had fallen three times [over] the past month. She noted ongoing problems with spasms, pain, significant fatigue, weakness and numbness of her upper extremities, and ongoing cognitive problems, particularly with memory." Dr. Guarnaccia's impression was that Barber's MS was in a progressive stage. Barber reported to Dr. Guarnaccia that she had "increased numbness in her hands, increased weakness in her legs, and poor concentration," In her appeal, Barber also argued that Sun Life incorrectly relied on the surveillance, improperly reclassified her occupational requirements, and discussed discrepancies within the reviews of Dr. Hall and Dr. LePorce.

On October 16, 2008, Barber submitted to Sun Life a medical report from Dr. Guarnaccia.[3]

Upon receipt of Barber's appeal, Sun Life requested a medical review from Elite Physicians, a division network of Network Medical Review Company. Sun Life asked the reviewer to "comment on any inconsistencies of the APS forms provided by the attending physician versus his examination notes" and requested that the reviewer comment on the adequacy of the surveillance in relation to Barber's function capacity.

On November 5, 2008, Dr. Ahmed Robbie conducted the review. Dr. Robbie was provided with the prior medical reviews from Dr. Hall and Dr. LeForce. Dr. Robbie found the surveillance to be "adequate to give clear physical functioning." Dr. Robbie stated that "[t]here is no documentation to support any cognitive impairment of memory limitation that would have prevented her from performing the job,"[4] Dr. Robbie never spoke with Barber or Dr. Guarnaccia.

On November 4, 2008, Mary P. O'Malley conducted another occupational analysis. She reviewed the job description form and the PDAW, both completed by X–Ray. O'Malley confirmed Boyd's analysis and "updated occupational description for Medical Sales Representative which is also classified as light work."

On November 21, 2008, Sun Life denied Barber's appeal.

## STANDARD

A motion for summary judgment may be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). In determining whether the record presents genuine issues for trial, the court must view all inferences and ambiguities in a light most favorable to the non-moving party. See *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991). A plaintiff raises a genuine issue of material fact if "the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Rule 56 "provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for sum-

---

3. The medical report stated the following: "In summary, Ms. Barber has a history of multiple sclerosis since 2001, which initially could be characterized as relapsing remitting. She had at least three attacks of her disease in the first year despite being treated with FDA approved medications, as well as progression of her diseases on MRI scan. She had been compliant with her therapies. Given that her response to therapies has been incomplete, it is not uncharacteristic that within a relatively short period of time, her disease has been progressive and her ongoing symptoms have not improved. Her examinations and testing have been consistent with her complaints, including her neuropsychological testing. All of these factors have been overlooked by consulting physicians that have been employed by her disability carrier reviewing her case. Fatigue, cognitive dysfunction, pain, and limited physical endurance are the most common reasons that individuals with multiple sclerosis leave the work force. These impairments are not easily demonstrated by a limited routine neurological basis. Given the course of her multiple sclerosis in light of the physical nature of her employment, including the carrying, lifting and walking, as well as travel considerations from office to office, and the cognitive demands, I do not believe that there is any basis for concluding that she is capable of full time employment."

4. He also stated "[o]n the documentation, all along it states that she is alert, oriented and able to give history without any limitation or difficulty. In addition, on the surveillance … [i]t is not shown that she has any cognitive impairment that would have prevented her from performing her job."

mary judgment; the requirement is that there be no genuine issue of material fact." *Id.* at 247–48, 106 S.Ct. 2505. "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims … [and] it should be interpreted in a way that allows it to accomplish this purpose." *Celotex v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## DISCUSSION

### I. Conflict of Interest–Standard of Review

Barber first argues that *Metropolitan Life Ins. v. Glenn,* 554 U.S. 105, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008) established a "new paradigm" for determining ERISA disability cases that calls for a "thorough and probing" standard of review. Specifically, Barber argues that when there is a conflict of interest, like there is in the present case, "courts within the Second Circuit must conduct a searching consideration of the evidence, in determining whether an insurer's determination is well supported, and taking account of an insurer's conflict of interest as a factor." She states that Sun Life's conflict and bias effected its decision.

Sun Life questions the Barber's interpretation of *Glenn,* and argues that when "the written plan documents confer upon a plan administrator the discretionary authority to determine eligibility, the court will not disturb the administrator's ultimate conclusion unless it is *arbitrary and capricious.*" *Pagan v. NYNEX Pension Plan,* 52 F.3d 438, 441 (2d Cir.1995) (emphasis added). Sun Life states that in this case, the policy provides the plan administrator with "sole and exclusive discretion and authority to carry out all actions involving claims procedures explained in the Policy."

In *Glenn,* the Supreme Court found that when an entity determines both employee eligibility and pays the benefits, this creates a conflict of interest, and held that "a reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying the benefits." *Glenn,* 554 U.S. at 108, 128 S.Ct. 2343. The Court articulates this not as a new standard, but rather as part of the deferential standard established in *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). *See Glenn,* 554 U.S. at 108, 128 S.Ct. 2343. Specifically, the Glenn Court held "that a plan administrator operating under a systematic conflict of interest is nonetheless still entitled to a deferential review," *Conkright v. Frommert,* 559 U.S. 506, 130 S.Ct. 1640, 1643, 176 L.Ed.2d 469 (2010).

In the context of a denial of coverage dispute, the court applies an arbitrary and capricious, rather than a de novo, standard of review, where the insurance policy at issue gives discretionary authority to the plan administrator. *Kinstler v. First Reliance Standard Life Ins. Co.,* 181 F.3d 243, 252 (2d Cir.1999). The court has recognized that although "no one word or phrase must always be used to confer discretionary authority, the administrator's burden to demonstrate insulation from de novo review requires either language stating that the award of benefits is within the discretion of the plan administrator or language that is the functional equivalent of such wording." *Id.*

In this case, the plan at issue specifically provides the claims fiduciary with the "discretionary authority to make claim, eligibility and other administrative determinations regarding those policies, and to interpret the meaning of their terms and language." The policy unequivocally confers discretionary authority on the plan

administrator and, therefore, the arbitrary and capricious standard applies to a review of the claim denial in this case. *See Pagan v. NYNEX Pension Plan,* 52 F.3d 438, 441 (2d Cir.1995). Therefore, the decision to terminate benefits may only be overturned "if it was without reason, unsupported by substantial evidence or erroneous as a matter of law." *Hobson v. Metro. Life Ins. Co.,* 574 F.3d 75, 83 (2d Cir.2009) (quoting *Pagan,* 52 F.3d at 442).

## II. *Change in Occupational Requirements*

■ The plaintiff argues that when Sun Life altered Barber's occupational classification from medium physical demand to light duty, it violated the standard established in *Kinstler v. First Reliance Standard Life Ins. Co.,* 181 F.3d 243 (2d Cir. 1999). In *Kinstler,* the second circuit stated that "regular occupation may not be defined without some consideration of the nature of the institution" where the employee worked and that one's job must be defined as a position of the "same general character" as her job." *Id.* at 253. Barber states that Sun Life "considered her job requirements "in a generic and global sense, but would not consider how she performed her job," Barber argues that Sun Life's reclassification of her job requirements was an abuse of discretion, because it failed to consider the material aspects of her job. She notes that at one point, prior to Sun Life taking over the obligation, a plan administrator had determined that Barber's occupation was physically demanding.

Sun Life responds that Barber's reliance on *Kinstler* is misplaced because the court in that case conducted a de novo review while the determination here is subject to the deferential arbitrary and capricious standard. As a result, according to Sun Life, the court may not upset the adminis-

trator's decision if it is reasonable. Sun Life also states that the second circuit has never determined that a regular occupation could not be defined by using DOT job descriptions. The defendant argues that adherence to the DOT'S classification was reasonable, and that "insurers cannot be expected to anticipate every job task an employer might place on an employee outside the usual requirements of his or her occupation." The DOT job description, according to Sun Life, "matches Plaintiff's job duties as described by her employer." Specifically, it includes "occasional (1–33% of the time) lifting, carrying, pushing or pulling of up to 20 lbs and frequent (34% up to 66%) lifting of up to 10 lbs or negligible amounts constantly." Sun Life states that it has the discretion to not only decide claims but also to interpret plan terms and that its interpretation of "regular occupation" and reliance on the DOT job description for sales representative, which matched Barber's specific job, was reasonable.

In her reply, Barber states that the second circuit has addressed the vocational issues in this case in *Kinstler.* In addition, in her opposition to Sun Life's motion for summary judgment, Barber argues that the DOT description differs in its physical requirements from her actual occupation. Specifically, she states that the DOT definition includes "frequent" lifting of up to 10 pounds and occasional lifting of up to 20 pounds, while her actual occupation required frequent lifting of 11–25 pounds.

The court concludes that under the applicable and deferential arbitrary and capricious standard of review, Sun Life's reclassification of Barber's occupational requirements was reasonable. Courts have recognized that the determination of an individual's "regular occupation" must be "defined as a position of the 'same general character' as [the claimant's]

job.'" *Kinstler,* 181 F.3d at 253. Sun Life considered the relevant and applicable DOT job description and the insurance company's description of the position in classifying Barber's occupation as light duty. Therefore, the plaintiff's motion for summary judgment, with respect to the reclassification of Barber's occupational requirements, is denied and the defendant's motion is granted.

### III. Claim Determination

█ Barber argues that in making the determination to deny her claim for disability benefits, Sun Life did not act reasonably and, therefore, its determination was arbitrary and capricious. Specifically, Barber argues that Sun Life's conflict of interest, selective review of medical records, termination of her claim without a change in condition, failure to consider social security findings and improper reliance on professional medical reviewers resulted in an improper denial of benefits. She also argues that Sun Life's denial was not supported by substantial evidence of record and, therefore, was arbitrary and capricious,

### a. Conflict of Interest

█ The plaintiff argues that Sun Life's conflict of interest led to a "claim handling bias [that] was so pervasive that the court must find Sun Life to have abused any discretion it may have been afforded."

The defendant responds that the conflict of interest did not influence the claim decision, and should not be "afforded any weight in the Court's review."

In *Glenn,* the Supreme Court determined that the record "said little about MetLife's efforts to assure accurate claims assessment." *Glenn,* 554 U.S. at 118, 128 S.Ct. 2343. As a result, the Court considered the conflict of interest as a substantial factor.

The current record indicates that Sun Life, while it had an inherent conflict of interest, went to great lengths to assure an accurate claims assessment. Sun Life referred Barber's file to multiple physicians and referred her occupational assessment to multiple reviewers.

The court concludes that the claim handling in this case, with respect to Sun Life's inherent conflict of interest, did not, itself, rise to the level of an arbitrary and capricious abuse of discretion. As the Supreme Court has recognized, a conflict of interest is one factor that the court considers in determining whether the decision to deny benefits was an abuse of discretion. *Metropolitan Life Ins. v. Glenn,* 554 U.S. 105, 108, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008).

### b. Selective Review of Medical Records

Barber next argues that "Sun Life's selective review of the medical materials is further evidence that Barber did not receive a full and fair review of her claim." Specifically, with respect to Dr. LeForce, Barber states that his review was based solely upon one medical record and surveillance. He relied upon Dr. Guarnaccia's notes from Barber's January 10, 2008 office visit and surveillance of Barber grocery shopping. Barber points to the fact that Dr. LeForce ignored important portions of Dr. Guarnaccia's notes, including the fact that Barber was suffering 3–4 electrical shock sensations per week[5] and her medications impacted her functionality. With respect to Dr. Robbie, Barber states that his review was based almost exclusively on surveillance and, therefore, lacks credibility. Finally, Barber argues that "Sun Life also sought to influence the independence of the review process"

---

5. Barber states that these shock sensations lasted 3 hours each.

through its "editorialization[6] of the evidence" and by giving its own medical assessment to the independent reviewing doctors. Barber further states that Sun Life selectively provided the reviewing doctors with Dr. Hall's report, but failed to provide Dr. Hicks' report because Dr. Hicks' opinion was favorable to Barber.

Sun Life responds that with respect to Dr. LeForce, "it is obvious from his report that [he] reviewed all of Plaintiff's medical records, based on the summary of treatment provided." Sun Life reiterates that it "consulted with no less than five independent specialists. Therefore, the thoroughness of its investigation should not be questioned." With respect to Dr. Robbie, Sun Life asserts that he "provided a list of the medical records that were reviewed and provided a detailed assessment of the medical evidence." Sun Life also argues that Dr. Guarnaccia's opinions cannot be reconciled with his own notes and with the surveillance of Barber. Specifically, Sun Life states that the "plaintiff's doctor acted more as an advocate than a true health care provider." With respect to its alleged influence on independent review process, Sun Life states that it was merely trying to address the issues Barber raised on appeal and that her arguments are "nothing more than rhetoric." Finally, Sun Life responds that there is no evidence of record that it did not provide the reviewing physicians with Dr. Hicks' report.

In her reply, Barber states that it is not clear from the record whether Dr. LeForce reviewed her entire claim file. Barber also states Sun Life did not provide Dr. Hicks' report to either Dr. Robbie or Dr. LeForce. With respect to Dr. Robbie, Barber argues that he failed to consider all of the medical documentation and testing on the plaintiff and that he and Dr. LeForce lacked the expertise and exposure to MS required to render an informed decision regarding Barber's capacity to work.

The court concludes that it is impossible to determine, from the current state of the record and at this stage of the case, whether and to what extent Dr. LeForce and Dr. Robbie reviewed Barber's entire medical record, including Dr. Hicks' report, before rendering their opinions. Based upon the existence of this material issue of fact, summary judgment is not appropriate. This issue is more properly addressed at the time of trial and after hearing the testimony of these witnesses.

### c. *No Change in Condition*

Barber next argues that because there was no change in her medically diagnosed condition from the time she was found to be unable to work until the time Sun Life discontinued her benefits, the termination of her benefits was arbitrary and capricious. She cites the court's decision in *Fairbaugh v. Life Ins. Co. of N. Am.*, 737 F.Supp.2d 68, 81 (D.Conn.2010), and argues that based on its parallel facts, it should "guide the result to be reached here." She states that in cases where there was no change in the plaintiff's condition, courts have found the decision to terminate benefits to be arbitrary and capricious.

Sun Life replies that it always remains the plaintiff's burden to demonstrate a disability and the defendant need not show a change in the plaintiff's condition. Specifically, Sun Life cites the tenth circuit for the proposition that " '[a] onetime determination of eligibility for benefits under the

---

**6.** Barber states that on the referral form that Sun Life provided to the reviewing physicians, Sun Life included a statement that the information provided by Dr. Guarnaccia was "very inconsistent." In addition, Sun Life allegedly asked Dr. LeForce if he would concur with the opinion of Sun Life's in-house medical consultant. Sun Life responds it was simply stating the obvious.

Plan does not foreclose subsequent principled review.' " *See Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1098 (10th Cir.1999). Sun Life further distinguishes *Fairbaugh* as a case in which the insurer terminated coverage based on the same evidence on which it relied to approve the initial claim. In this case, however, the surveillance evidence contradicts the information the insurer relied upon in initially approving Barber's claim.

Barber replies that the *Fairbaugh* case is directly relevant because it also involved an MS patient, the same treating physician, Dr. Guarnaccia, and similar alleged claims handling problems.

In *Fairbaugh,* the court concluded that the administrator's termination of long term disability benefits was arbitrary and capricious where the defendant presented no new evidence to support the decision, *Fairbaugh,* 737 F.Supp.2d at 81. The insurer terminated disability benefits based upon the same medical documentation on which it had relied to grant the same benefits months earlier. *Id.* The court also noted that the plaintiff's condition in that case had not improved, but had, if anything, worsened. *Id.* In this case, however, Sun Life relied upon additional medical reviews and surveillance in making its determination.

The court concludes that the burden of proving disability remains with the plaintiff. The mere fact that Barber did not have an improvement in her condition does not warrant summary judgment in this case. The court will be in a better position at the time of trial, after hearing witness testimony, to determine whether Sun Life's decision was arbitrary and capricious,

### d. *Consideration of Social Security Decision*

■ Barber next argues that Sun Life failed to consider social security findings with respect to her disability. Specifically, Barber states that "[i]t is troubling that Sun Life was perfectly willing to accept Social Security's determination finding Barber disabled for purposes of invoking the offset provisions in her policy, yet, it ignores the substance of the medical impairments which led to Social Security's finding of disability." Barber argues that this fact gives more weight to the conflict of interest factor in this case.

Sun Life responds that it did consider the social security disability award and it explained, in a final letter to Barber, why it determined that she was not disabled. Sun Life states that it was not obligated to follow the social security determination.

It is evident from Sun Life's letter that it did consider Barber's social security determination. In explaining its denial of benefits in the face of the social security determination. Sun Life stated as follows; "[a]s no further information has been provided to us regarding the status of Ms. Barber's Social Security claim, we are not aware of any additional evaluations that may have been conducted by the Social Security Administrator or if any additional clinical documentation not made available to us may have been provided to the Social Security Administration for review." Sun Life's decision to terminate benefits in the face of the social security determination to the contrary is a factor that the court may consider in determining, at the time of trial, whether Sun Life's decision was arbitrary and capricious. It is not, in and of itself, sufficient to warrant summary judgment.

### e. *Improper Reliance on Professional Medical Reviewers*

Barber next argues that "Sun Life failed to provide [her] with a full and fair review,

failing to have the appropriately qualified medical personnel review her claim, and in adopting opinions of biased, paper reviewing doctors over her long standing treating doctor, without any meaningful justification." Specifically, she argues that Dr. LeForce, Dr. Hall and Dr. Robbie were "not appropriately familiar with Multiple Sclerosis," while her treating physician, Dr. Guarnaccia, is very experienced in the area. She also states that Dr. LeForce has performed "thousands of medical reviews for insurance companies," and "Dr. Hall has been criticized in several court decisions." Barber argues that with a condition like Multiple Sclerosis, functionality is best assessed and determined by specialists in the area. Barber acknowledges that Sun Life is not obligated to simply accept Dr. Guarnaccia's opinion, however she states that "it is not permitted to blanketly reject," it either "without any sound basis." Barber argues that a treating physician's conclusions, while no longer afforded "special deference," *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003), should "logically be afforded more deference than physicians who only perform paper reviews," She states that Dr. Guarnaccia is her long-standing treating physician, is a renowned Multiple Sclerosis specialist, has rendered consistent opinions regarding Barber's disability and has based his decisions on clinical and diagnostic evaluations.

Sun Life responds that a treating physician's opinions are not entitled to special deference. With respect to the reviewing doctors. Sun Life states that it had five independent physicians review Barber's claim and that each one was "board-certi-fied in a specialty area relevant to Plaintiff's condition (MS) and the bases for her claimed disability." Specifically, the physicians included two psychologists, and internist and two neurologists. Sun Life argues that these physicians were qualified to assess Barber's impairment and that Barber "confuses treatment and diagnosis with assessment of impairment." Moreover, Sun Life states that the second circuit in *Hobson v. Metro. Life Ins. Co.,* 574 F.3d 75, 83 (2d Cir.2009), recognized that an insurer's consideration of a physician's opinion was not an abuse of discretion simply based on the fact that the physician was "selected, and presumably compensated by [the insurer.]" *Id.* at 88. Sun Life further points out that all of the reviewing physicians agreed that Barber could perform light duty work and the only physician who did not agree was her treating physician, Dr. Guarnaccia, who "based his opinion on Plaintiff's subjective complaints despite the inconsistencies with the objective evidence." Specifically, Sun Life argues that while a treating physician must rely *on* subjective complaints in making a diagnosis, the administrator is not required to do so in making a disability determination. According to Sun Life, "there is no basis in fact or law to give Dr. Guarnaccia's advocate-based and contradicted opinions preference over the opinions of Drs. Robbie, LeForce and Hall." [7]

Barber replies that *Hobson* does not compel the same result here because in that case, the treating doctors waivered on the question of whether the plaintiff was disabled, while in this case, Dr. Guarnaccia has never changed his opinion that Barber is disabled and unable to work. In addition, Barber points to the fact that in

7. In its motion for summary judgment. Sun Life states that Dr. Guarnaccia's notes record Barber's symptoms largely as mild and stable, which is inconsistent with his disability determination. Sun Life points to "a vast lack of objective findings on physical examination," in Dr. Guarnaccia's notes.

*Hobson,* the reviewing doctors talked to the treating doctors, while in this case, Dr. Guarnaccia never discussed Barber's condition with Sun Life's reviewing physicians. Further, the disability in *Hobson* was based on fibromyalgia, a "controversial" disease very different from the progressive disease of MS. Barber points to the fact that in *Hobson,* there was some evidence that the plaintiff's conditions may have resolved while in this case, there is no evidence that Barber's MS has resolved. She also states that in *Hobson,* there was no conflict of interest in the insurance company's claims handling. Finally, with respect to the treating physician rule, Barber argues that although Dr. Guarnaccia is not entitled to special deference, his opinion must be afforded some deference in balancing the other physician opinions in this case based upon his long standing treatment of Barber, his credentials and the consistency of his opinion of her condition. Barber states that other courts' criticisms of Drs. LeForce and Hall challenge their credibility and should be taken into consideration.

 With respect to ERISA claims, the Supreme Court has recognized that,

> [p]lan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician. But, we hold, courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.

*Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 834, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003). Therefore, the Court has recognized that treating physicians' opinions are not afforded special deference in the context of an ERISA claim. In this case, the administrator relied upon the review of five independent physicians. The question of their credibility and the validity of their opinions can be more appropriately assessed at the time of trial. In addition, the question of whether Sun Life correctly considered Dr. Guarnaccia's opinion may be more appropriately addressed at trial. Therefore, with respect to the issue of the propriety of the medical review of Barber's claim, the motions for summary judgment are denied.

### f. *Substantial Evidence*

Finally, Barber argues that the termination of benefits in this case was not supported by substantial evidence, but "[r]ather, Sun Life's claim decision was the culmination of result oriented claim practices designed to prevent a full and fair review of Barber's claim." Specifically, she argues that Sun Life's reliance on non-examining physician reviews of her condition based only on medical records is not sufficient evidence where the physicians were not properly qualified. In addition, she argues that "Sun Life's efforts to rely almost exclusively upon the results of surveillance will not constitute substantial evidence." Specifically, she states that "the surveillance does not constitute substantial evidence, as it fails to document sustained activity that can translate to Barber's occupational requirements." [8]

---

8. Specifically, in her opposition to the defendant's motion to dismiss, Barber states that the surveillance consists of "limited activities for limited durations" and is "not inconsistent with what Barber advised she was capable of" and, therefore, "hardly constitutes substantial evidence that Sun Life can rest upon almost entirely to sustain its claim determination."

Sun Life responds that the burden of proving her disability, on a continuing basis, remains with Barber. According to Sun Life, its "determination finds ample support in Plaintiff's own medical records, the reports of no less than five independent medical specialists as well [sic] Plaintiff's own documented activities during surveillance." Sun Life reiterates that the surveillance and some of Dr. Guarnaccia's own notes, are in conflict with his conclusion that Barber is disabled and unable to work.[9] With respect to the surveillance, Sun Life argues that the "Plaintiff's documented activities were but one factor in Sun Life's determination to terminate Plaintiff's benefits, but a factor which fully supports the decision." Finally, with respect to its alleged conflict of interest, Sun Life states that this factor is not given any weight in the absence of evidence that it influenced the defendant's decision. Sun Life states that Barber has presented no such evidence and, to the contrary, "[t]hroughout the course of the claim, Sun Life clearly demonstrated that it was willing to make decisions against its own financial interest in favor of an unbiased review of Plaintiff's claim."

The court concludes that material issues of fact prevent the resolution of this case at this time. As previously stated, the ultimate issue of whether Sun Life's decision to terminate Barber's disability benefits was arbitrary and capricious is more appropriately resolved at trial, after the record is more fully developed. Similarly, and as part of that decision, the court must determine whether the decision is supported by substantial evidence of record.

The court must hear and determine the witnesses' credibility, including that of Barber, Dr. Guarnaccia and the reviewing physicians. Only after hearing such testimony and a review of the record, will the court be in the position to determine whether Sun Life's decision was arbitrary and capricious.

### CONCLUSION

With respect to the issue of the change in the plaintiff's occupational requirements, the defendant's motion for summary judgment (document no. 59) is granted and the plaintiff's motion (document no, 53) is denied. In all other respects, the cross motions for summary judgment (documents 53 and 59) are DENIED.

---

**9.** Specifically, in its motion for summary judgment, Sun Life states that the surveillance showed Barber moving in a manner that was at odds with her subjective complaints of weakness, fatigue, numbness and spasms and her alleged inability to walk, stand, carry and lift or drive in 2008 and 2009. In addition. Sun Life points to the fact that Barber refused to submit to an independent medical examination ("IME"). In her opposition, however, Barber argues that this is untrue and that Sun Life determined that the IMS would not be necessary.